NOT YET SCHEDULED FOR ORAL ARGUMENT
PUBLIC COPY—SEALED MATERIAL DELETED

**21-7078**

# United States Court of Appeals
# for the District of Columbia Circuit

STATE OF NEW YORK; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF FLORIDA; STATE OF IOWA; STATE OF NEBRASKA; STATE OF NORTH CAROLINA; STATE OF OHIO; STATE OF TENNESSEE; STATE OF ALASKA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF CONNECTICUT; STATE OF DELAWARE; TERRITORY OF GUAM; STATE OF HAWAII; STATE OF IDAHO; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW HAMPSHIRE; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF TEXAS; STATE OF UTAH; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WEST VIRGINIA; STATE OF WISCONSIN; AND STATE OF WYOMING,

*Plaintiffs-Appellants,*

v.

FACEBOOK, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

BARBARA D. UNDERWOOD
*Solicitor General*
STEVEN C. WU
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Assistant Solicitor General*
*of Counsel*

*(Complete counsel listing appears on signature pages.)*

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005
philip.levitz@ag.ny.gov
(212) 416-6325

Dated: January 14, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.    Parties

The plaintiffs-appellants are the State of New York, District of Columbia, State of California, State of Colorado, State of Florida, State of Iowa, State of Nebraska, State of North Carolina, State of Ohio, State of Tennessee, State of Alaska, State of Arizona, State of Arkansas, State of Connecticut, State of Delaware, Territory of Guam, State of Hawaii, State of Idaho, State of Illinois, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State of North Dakota, State of Oklahoma, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Texas, State of Utah, State of Vermont, Commonwealth

of Virginia, State of Washington, State of West Virginia, State of Wisconsin, and State of Wyoming.

The defendant-appellee is Facebook, Inc. (In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc.; however, the caption in this case has not been changed.)

The parties and caption in this Court are the same as in the district court.

As of the date of this filing, no amici curiae or intervenors have appeared in the district court or in this Court.

## B.    Ruling Under Review

The ruling under review is the Memorandum Opinion of the Honorable James E. Boasberg (ECF No. 137) and accompanying Order (ECF No. 136), each dated June 28, 2021, which granted defendant-appellee Facebook, Inc.'s motion to dismiss and dismissed this case. The Memorandum Opinion and Order do not yet have official reporter citations, but the Memorandum Opinion is available on electronic databases, *New York v. Facebook, Inc.*, No. 20-cv-3589, 2021 WL 2643724 (D.D.C. June 28, 2021).

## C.    Related Cases

This case has not previously been before this Court or any other court. There is one related case, *FTC v. Facebook, Inc.*, No. 20-cv-3590, pending in the U.S. District Court for the District of Columbia, although the state plaintiffs in this case are not parties to the FTC's case. The FTC's case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

GLOSSARY ...............................................................................x

PRELIMINARY STATEMENT ..................................................... 1

JURISDICTIONAL STATEMENT ............................................... 4

ISSUES PRESENTED ................................................................ 4

PERTINENT STATUTES ........................................................... 5

STATEMENT OF THE CASE ..................................................... 5

    A.   Factual Background.......................................................... 5

        1.   The market for personal social networking services ........ 5

        2.   Facebook's dominance of the market for personal social networking services ................................................. 6

        3.   Facebook's ongoing efforts to "buy or bury" potential competitors .......................................................... 7

            a.   Acquisitions to "buy" nascent competitors................. 8

                i.   Instagram .......................................................... 9

                ii.   WhatsApp ......................................................... 10

                iii.   Other acquisitions ........................................... 11

            b.   Policies to "bury" potential competitors.................. 11

            c.   Harms to competition and consumers ..................... 13

    B.   Procedural Background ......................................................... 14

i

**Page**

    1.  The States' complaint ...................................................... 14

    2.  The district court's dismissal ......................................... 15

STANDARD OF REVIEW ...................................................... 18

SUMMARY OF ARGUMENT ................................................. 18

ARGUMENT ...................................................... 22

POINT I

THE DISTRICT COURT ERRED IN APPLYING LACHES TO DISMISS
THE STATES' ACQUISITION-BASED CLAIMS ........................................... 22

  A.  Laches Does Not Apply to States Suing to Enforce
the Law and Protect Public Rights......................................... 22

  B.  Assuming That Laches Can Apply Against the States,
the District Court Misapplied the Doctrine to Bar the
States' Claims Here. ............................................................ 28

    1.  The district court improperly "presumed" prejudice
to Facebook without adequate factual basis. .................. 30

    2.  The district court improperly assumed that the
States unreasonably delayed in filing their complaint. .... 36

POINT II

THE DISTRICT COURT ERRED IN DISMISSING THE STATES'
PLATFORM-BASED CLAIM ................................................... 42

  A.  The District Court Wrongly Concluded That
Injunctive Relief Was Unavailable for the Alleged
Platform-Related Conduct. .................................................... 44

**Page**

      1.   The district court had no basis for finding that Facebook ceased its unlawful conduct when the complaint alleges otherwise. ........................................... 44

      2.   Injunctive relief would remain available even if Facebook had in fact halted anticompetitive platform-related conduct. ................................. 46

  B.   The District Court Erroneously Disregarded the States' Allegations Regarding the Scope and Effect of Facebook's Platform Policy. ................................. 50

  C.   The District Court Too Narrowly Construed Both the Alleged Course of Conduct and Governing Antitrust Precedents. ............................................ 53

      1.   The district court improperly evaluated Facebook's platform-related conduct in isolation, rather than as part of a unified course of conduct. ........................... 55

      2.   The district court erred in construing Facebook's platform-related conduct as a mere refusal to deal that could not give rise to antitrust liability as a matter of law. ................................................. 58

      3.   The district court improperly dismissed the States' claims without providing an opportunity for further factual development ....................................... 67

CONCLUSION ..................................... 70

iii

# TABLE OF AUTHORITIES[1]

| **Cases** | **Page(s)** |
|---|---|

*Allee v. Medrano,*
416 U.S. 802 (1974) .................................................................. 46

**Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) ........................................... 21, 63, 64, 67

*Atherton v. District of Columbia Office of the Mayor,*
567 F.3d 672 (D.C. Cir. 2009) ............................................. 69

*Biden v. Knight First Amend. Inst. at Columbia Univ.,*
141 S. Ct. 1220 (2021) .................................................... 3, 67

*California v. American Stores Co.,*
495 U.S. 271 (1990) ........................................................ 26, 27

*City of Anaheim v. Southern Cal. Edison Co.,*
955 F.2d 1373 (9th Cir. 1992) ..................................... 56, 58

**Continental Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962) ....................................................... 21, 56

*Costello v. United States,*
365 U.S. 265 (1961) ....................................................... 25, 35

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
398 F.3d 666 (D.C. Cir. 2005) ..................................... 22, 68

**Daingerfield Island Protective Soc'y v. Lujan,*
920 F.2d 32 (D.C. Cir. 1990) ........................... 29, 30, 31, 36

*Duty Free Ams., Inc. v. Estée Lauder Cos.,*
797 F.3d 1248 (11th Cir. 2015) ......................................... 48

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

## Cases                                                                     Page(s)

\*Eastman Kodak Co. v. Image Tech. Servs., Inc.,
  504 U.S. 451 (1992) ....................................................................... 63, 67

Farrar v. Nelson,
  2 F.4th 986 (D.C. Cir. 2021) ............................................................ 18

Ford Motor Co. v. United States,
  405 U.S. 562 (1972) .......................................................................... 49

\*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
  528 U.S. 167 (2000) ............................................................... 20, 46, 47

FTC v. Actavis, Inc.,
  570 U.S. 136 (2013) .......................................................................... 61

FTC v. Facebook, Inc.,
  No. 20-cv-3590 (D.D.C. Jan. 12, 2022) ...................................... 17, 35

FTC v. Qualcomm Inc.,
  969 F.3d 974 (9th Cir. 2020) ........................................................... 68

Gaudreau v. American Promotional Events, Inc.,
  511 F. Supp. 2d 152 (D.D.C. 2007) ................................................. 33

Gregory v. Ashcroft,
  501 U.S. 452 (1991) .......................................................................... 26

\*Guaranty Tr. Co. of N.Y. v. United States,
  304 U.S. 126 (1938) ........................................................ 18, 19, 22, 23

Gull Airborne Instruments, Inc. v. Weinberger,
  694 F.2d 838 (D.C. Cir. 1982) ......................................................33-34

Hurd v. District of Columbia, Gov't,
  864 F.3d 671 (D.C. Cir. 2017) ......................................................... 44

Illinois v. Kentucky,
  500 U.S. 380 (1991) .......................................................................... 23

| Cases | Page(s) |
|---|---|

*In re G-Fees Antitrust Litig.*,
584 F. Supp. 2d 26 (D.D.C. 2008) ...................................................... 48

*In re Nifedipine Antitrust Litig.*,
335 F. Supp. 2d 6 (D.D.C. 2004) ........................................................ 48

*International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*,
518 F.2d 913 (9th Cir. 1975) ........................................................ 26, 31

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
677 F.2d 1045 (5th Cir. 1982) .......................................................... 31

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ................................................. 56, 57, 58

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951) .............................................................. 60-61, 62

*Loumiet v. United States*,
828 F.3d 935 (D.C. Cir. 2016) .......................................................... 38

*Massachusetts ex rel. Bellotti v. Russell Stover Candies, Inc.*,
541 F. Supp. 143 (D. Mass. 1982) ................................................ 23-24

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................................................... 29

*Menominee Indian Tribe of Wisconsin v. United States*,
614 F.3d 519 (D.C. Cir. 2010) ............................................... 18, 19, 28

*National Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ......................................................................... 48

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ................................................ 61-62, 68

*Ohio, Dep't of Transp. v. Sullivan*,
527 N.E.2d 798 (Ohio 1988) ............................................................. 23

## Cases                                                          Page(s)

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
    797 F.2d 370 (7th Cir. 1986)................................................. 68

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ............................................... 49

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)................................................... 61, 65

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)..................................................... 38

*Pro-Football, Inc. v. Harjo*,
    415 F.3d 44 (D.C. Cir. 2005) ......................................... 29, 31

*Pro-Football, Inc. v. Harjo*,
    567 F. Supp. 2d 46 (D.D.C. 2008) ....................................... 35

*Puerto Rico v. Carpenter Co.*,
    442 F. Supp. 3d 464 (D.P.R. 2020)...................................... 27

*Ralls Corp. v. Committee on Foreign Inv. in the U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ........................... 5, 18, 20, 51

*SEC v. First Am. Bank & Tr. Co.*,
    481 F.2d 673 (8th Cir. 1973)............................................ 47

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) .......................................... 47

*Smith-Haynie v. District of Columbia*,
    155 F.3d 575 (D.C. Cir. 1998) ......................................... 18

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) .......................................... 38

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020)................................................. 25

| Cases | Page(s) |
|---|---|

*United States v. Borden Co.,*
347 U.S. 514 (1954).......................................................... 26, 29, 39

*United States v. Dentsply Int'l, Inc.,*
399 F.3d 181 (3d Cir. 2005) ............................................... 53

*United States v. Grinnell Corp.,*
384 U.S. 563 (1966)........................................................... 43, 54

*United States v. Letter from Alexander Hamilton to the*
*Marquis de Lafayette Dated July 21, 1780,*
15 F.4th 515 (1st Cir. 2021)............................................... 23

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) ...... 3, 21, 32, 43, 48, 53, 54, 60, 63, 66, 67

*United States v. Mottolo,*
605 F. Supp. 898 (D.N.H. 1985)........................................ 23

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004)............................................................ 61, 63, 64

*Viamedia, Inc. v. Comcast Corp.,*
951 F.3d 429 (7th Cir. 2020)........................................... 64, 68

*Washington v. LG Elecs., Inc.,*
375 P.3d 636 (Wash. 2016) ............................................... 24

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
395 U.S. 100 (1969)........................................................... 32

## Laws

15 U.S.C.
§ 2 ...................................................................................... 15
§ 18 .................................................................................... 15
§ 18a .................................................................................. 41
§ 26 .................................................................................... 24, 25

**Miscellaneous Authorities**                **Page(s)**

C. Scott Hemphill & Tim Wu, *Nascent Competitors*,
168 U. Pa. L. Rev. 1879 (2020) ............................................... 37, 40, 66

Competition & Mkts. Auth., *Completed Acquisition by
Facebook, Inc (Now Meta Platforms Inc) of Giphy, Inc.:
Summary of Final Report* (Nov. 30, 2021),
https://tinyurl.com/ycknk247 ................................................................ 8

Herbert Hovenkamp, *Antitrust and Platform Monopoly*,
130 Yale L.J. 1952 (2021) .................................................................. 50

Press Release, Eur. Comm'n, *Mergers: Commission Fines
Facebook €110 Million for Providing Misleading
Information About WhatsApp Takeover* (May 18, 2017),
https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1369 ...... 38

1 William Blackstone, *Commentaries* (Lewis ed. 1902) (1765) ............. 23

**GLOSSARY**

API                          application programming interface

FTC                          Federal Trade Commission

## PRELIMINARY STATEMENT

Facebook is a monopolist that has exploited its immense market power to crush competition. Through an ongoing course of conduct to "buy or bury" nascent competitors, Facebook has maintained a monopoly that harms its users and the public at large. A coalition of forty-eight plaintiff States[2] filed this antitrust action to hold Facebook accountable for its anticompetitive conduct and protect consumers from further harm. Without allowing discovery, the U.S. District Court for the District of Columbia (Boasberg, J.) dismissed the States' complaint, concluding that (1) laches barred the States' claims based on Facebook's anticompetitive acquisitions; and (2) the States could not obtain injunctive relief on their claim that Facebook sought to bury nascent competitors, including by conditioning and selectively denying access to its platform. This Court should reverse.

The district court's determination that laches bars the States' acquisition-based claims is erroneous for multiple independent reasons.

---

[2] The plaintiffs include the forty-six States identified on the cover page, the District of Columbia, and the Territory of Guam; they are referred to collectively as "the States."

Laches does not apply against sovereign States suing to protect the public interest, like the States here. And even if laches could apply against the States, the district court misapplied the doctrine by failing to afford adequate deference to the States' critical role in protecting the public interest through antitrust enforcement actions like this one. The district court thus erred in presuming—contrary to the allegations in the complaint—that Facebook would suffer prejudice and that the States had unreasonably delayed their suit. As this Court has repeatedly recognized, such fact-intensive questions should not be resolved at the motion-to-dismiss stage.

The district court's dismissal of the States' platform-based claim also warrants reversal—again, largely because the district court relied on presumptions contrary to the complaint. For example, the court assumed that Facebook had ceased its unlawful platform conduct by 2018 and that injunctive relief was thus categorically unavailable. But the States' complaint alleges otherwise. And injunctive relief remains available even when a monopolist ceases its unlawful conduct. Similarly, the court credited Facebook's characterizations of its platform policy, rather

than accepting as true (as it was required to do) the complaint's allegations that Facebook's policy prohibited third-party apps that posed a competitive threat from accessing its platform.

At base, the district court's refusal to allow the States to proceed to discovery reflected an extraordinary, insupportably narrow view of the scope of the federal antitrust laws. This Court has repeatedly made clear that antitrust laws must be applied flexibly because "the means of illicit exclusion, like the means of legitimate competition, are myriad." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc). And such flexibility is particularly important for digital markets like the one for personal social networking services, since "applying old doctrines to new digital platforms is rarely straightforward." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring). The district court's precipitous dismissal disregarded both the breadth of the antitrust laws and the extensive allegations in the States' complaint, and freed Facebook to continue harming competition, chilling innovation and investment in social-networking alternatives, and degrading user experience, privacy, and data protection. This Court should reverse and allow the States' well-pleaded claims to proceed.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337. The district court issued a final order on June 28, 2021. (Joint Appendix (JA) 216.) The States filed a timely appeal on July 28, 2021. (JA 284.) This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

(1)(a) Whether the equitable doctrine of laches applies to sovereign state enforcement proceedings.

(b) Whether, even if so, the district court failed to give adequate deference to the States' enforcement prerogatives and improperly assumed prejudice to Facebook and unreasonable delay by the States in dismissing the acquisition-based claims on laches grounds.

(2)(a) Whether injunctive relief is available in this antitrust enforcement action by sovereign States.

(b) Whether the district court made improper assumptions, contrary to the complaint's allegations, regarding the scope and effect of Facebook's platform policy.

4

(c) Whether the district court too narrowly construed Facebook's alleged misconduct and well-settled antitrust principles in dismissing the States' monopolization claim.

## PERTINENT STATUTES

Pertinent statutes are set forth in the addendum at the conclusion of this brief.

## STATEMENT OF THE CASE

**A.    Factual Background**[3]

**1.    The market for personal social networking services**

Personal social networking services are online services that enable people to maintain personal relationships and share experiences with friends, family, and other connections in a shared social space equivalent to a digital "town square." (JA 50, 52-53 (¶¶ 28, 36).) Facebook is, by far, the largest personal social network, and dominates the market for personal social networking services. (JA 53, 61-62, 353-354 (¶¶ 38, 66-72).)

---

[3] The facts in this section are taken from the complaint and must be treated as true. *See, e.g., Ralls Corp. v. Committee on Foreign Inv. in the U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014).

The market for personal social networking services has distinct features. First, users do not pay to use Facebook's social network; instead, users provide Facebook their personal data, which Facebook monetizes by selling ads tailored to its users. (JA 45, 57 (¶¶ 2-3, 51).) Second, there are substantial barriers to entering the market, including network effects: because the value of a network to users increases as more users join, new entrants have difficulty gaining traction against a well-established incumbent like Facebook. (JA 54 (¶ 41).)

### 2. Facebook's dominance of the market for personal social networking services

Facebook launched in 2004, when the market for personal social networking services was emerging. (JA 59 (¶¶ 60-61).) By 2008, Facebook had become the largest personal social network in the world and, by 2011, boasted that it comprised "95% of all social media in the US" (JA 60 (¶¶ 66, 68)). Today, more than half of the U.S. population over age thirteen use a Facebook service every day. (JA 45 (¶ 1).)

Facebook initially came to dominate the market for personal social networking services, in substantial part, by entering into mutually beneficial relationships with third-party app developers. (JA 48, 62 (¶¶ 14,

79).) Facebook created a set of application programming interfaces (APIs) that permit third-party apps to connect to, use features from, and share data with the Facebook platform. (JA 62-63 (¶¶ 80-82).) Among these APIs are (1) Find Friends, which allows users to find and interact with their Facebook friends on other apps; (2) Facebook Connect, which lets users sign into third-party apps using their Facebook credentials; and (3) Open Graph APIs, which enable third-party apps to add Facebook plug-ins such as a "Like" button on the third-party app. (JA 63, 90-91, 92-93 (¶¶ 81-82, 190-191, 197).) Facebook benefits from offering its APIs because their use by third parties leads to greater user engagement and additional user data that support Facebook's advertising business. Third parties in turn value API access because it enables them to expand their products' features and distribution. (JA 62-63, 92-93 (¶¶ 80-82, 195-197).)

### 3.   Facebook's ongoing efforts to "buy or bury" potential competitors

Once Facebook dominated the market for social networking services (see *supra* at 6), it initiated a strategy to maintain its monopoly power by either buying potential competitors, or, if buying was not an option,

burying them by exploiting reliance on its platform to prevent them from successfully competing. (JA 45-46, 67-68, 69 (¶¶ 4-6, 99, 104).)

### a.    Acquisitions to "buy" nascent competitors

From 2012 through 2020, Facebook acquired dozens of companies, and pursued many more acquisitions. Many acquisitions were pursued in an anticompetitive effort to eliminate or thwart nascent competition—in Facebook CEO Mark Zuckerberg's words, to "build a competitive moat" around Facebook—and maintain its monopoly. (JA 46, 69-70 (¶¶ 5, 105-106).) Facebook continues to seek to identify and acquire competitive threats. (JA 88-89 (¶¶ 181-183).)[4]

---

[4] For instance, while this appeal was pending, the United Kingdom's competition authority determined that Facebook's recent acquisition of the leading provider of "GIF" visual content, GIPHY, was anticompetitive, and ordered Facebook to divest GIPHY. *See* Competition & Mkts. Auth., *Completed Acquisition by Facebook, Inc (Now Meta Platforms Inc) of Giphy, Inc.: Summary of Final Report* (Nov. 30, 2021), https://tinyurl.com/ycknk247.

### i. Instagram

When Facebook acquired Instagram, Instagram was an innovative and rapidly growing social network emphasizing photo sharing. While Facebook was built for computers, Instagram was built for increasingly popular mobile devices with built-in cameras. (JA 70 (¶¶ 107-110).)

Zuckerberg believed mobile-based apps like Instagram could "replace us" (JA 71 (¶ 111)), given Facebook's weakness in exploiting mobile photos (JA 68, 71 (¶¶ 100, 113)). That threat to Facebook's monopoly led Zuckerberg to pursue acquiring Instagram to, as he admitted, "neutralize a potential competitor." (JA 71-72 (¶¶ 114-116).) Instagram got the message. As its CEO explained, it would accept the acquisition to avoid "the wrath of [M]ark"—that is, the risk that Facebook would exploit Instagram's reliance on Facebook's APIs to bury Instagram if Instagram refused to sell. (JA 73 (¶ 120).)

Instagram accordingly agreed to be acquired by Facebook for $1 billion. At the time, Instagram had only sixteen employees and no revenue stream. A substantial portion of the purchase price was a premium Facebook was willing to pay to remove a competitive threat. (JA 70, 74 (¶¶ 107, 122).)

### ii. WhatsApp

Having subdued the competitive threat of Instagram, Facebook identified its relative weakness in mobile messaging as its top remaining competitive threat in the mobile era. (JA 69, 80-82 (¶¶ 103, 150-153).) Facebook was particularly concerned about WhatsApp, a fast-growing messaging app that Facebook viewed as a "category leader" with "better interface" and "better product" than other messaging apps. WhatsApp was available on multiple mobile operating systems and had recently surpassed Facebook's messenger service as the world's most popular messaging app. (JA 82-83 (¶¶ 154-157, 159-160).) Although WhatsApp did not then offer personal social networking services, Facebook was concerned that it could capitalize on its massive user base, add social features, and enter that market. (JA 83 (¶¶ 160-161).)

In 2014, Facebook acquired WhatsApp for nearly $19 billion. (JA 85 (¶ 166).) Facebook's own employees and outside market analysts recognized that this acquisition price "sounds insane" for a company like WhatsApp, which had virtually no revenue. Facebook paid this huge premium to eliminate a competitive threat. (JA 85-86 (¶¶ 168-170).)

### iii.  Other acquisitions

Instagram and WhatsApp are just two of Facebook's many acquisitions and attempted acquisitions designed to eliminate nascent competitors. (*See* JA 75-80, 88-89, 368-370 (¶¶ 129-148, 181-184).) Facebook even has made acquisitions specifically to assist in its strategy of finding and eliminating competitive threats. One such acquisition was Onavo, which had developed technology to monitor and analyze app usage. After purchasing Onavo, Facebook cut off the company's customers and used Onavo-generated data to identify emerging apps that posed competitive threats. (JA 77-80 (¶¶ 137-148).)

### b.  Policies to "bury" potential competitors

Facebook originally made its APIs broadly available to app developers, welcoming them to develop apps that integrated with Facebook's services due to the significant benefits that Facebook itself reaped from these partnerships. (JA 90, 92 (¶¶ 188-189, 195-196).) Facebook came to fear, however, that some app developers might also work with Facebook's rivals, or might themselves compete against Facebook. Facebook accordingly implemented policies to take advantage of app developers' reliance

11

on Facebook APIs to force them to refrain from actions that Facebook deemed a competitive threat.

For example, in 2011, Facebook adopted a policy that forbade apps that linked or integrated with competing social network platforms (and the platforms themselves) from accessing Facebook's APIs. (JA 93 (¶ 199).) Facebook implemented the policy in response to a substantial threat that emerged when Google launched a competing platform: Google+. (JA 93 (¶ 199); *see also* JA 66 (¶¶ 92-93).) Google+ thereafter failed to take off and ultimately ceased operations. (JA 67 (¶ 97).) But Facebook continued enforcing its policy to undermine other nascent competitors. (JA 93 (¶¶ 200-201).)

In 2013, to further discourage app developers from creating new social-networking features that might compete with Facebook's, Facebook amended its policy to block API access for apps that "replicat[e] [Facebook's] core functionality." (JA 93-94 (¶¶ 201-202).) In 2014, Facebook began reviewing all requests to access many APIs, even for apps that already had API access, so that Facebook could pick and choose which apps had platform access. (JA 94 (¶ 203).) These policies resulted in removal of existing API access for many apps. (JA 93-102, 386-395

(¶¶ 202-231).) Facebook also refused to grant API access in the first instance to apps it deemed potential competitors, like the video-sharing app Vine. (JA 94, 96-97, 389-390 (¶¶ 203, 213-214).) And Facebook has used control of its APIs to degrade the functionality and distribution of potential rivals' content, including by covertly suppressing traffic to the rivals through its APIs. (*See, e.g.*, JA 95, 99, 101, 392-394 (¶¶ 205, 223, 227-228).) For instance, after acquiring Instagram, Facebook suppressed all posts on Instagram that linked to photo-sharing app Phhhoto without informing the posting users. A number of apps, including Phhhoto, have shut down as a result of Facebook's efforts. (JA 97, 100-101, 390, 393-394 (¶¶ 216, 224, 229).)

### c.    Harms to competition and consumers

Facebook's "buy or bury" strategy has deterred competition in the market for personal social networking services and degraded the consumer experience, thus inflicting the very harms that the federal antitrust laws were intended to prevent.

For current and potential competitors, Facebook's conduct has "sent a message" that efforts to challenge its dominance in the personal social networking market "would be undermined in any manner possible."

13

(JA 102 (¶ 231).) That message continues to "chill[] innovation, deter[] investment, and forestall[] competition" in the market. (JA 46 (¶ 6); *see also* JA 48, 101-102 (¶¶ 15, 230-231).) In turn, millions of social networking consumers "continue to be deprived of the benefits of additional competition," including improvements to features, functionalities, and consumer choice. (JA 106 (¶ 247).) And Facebook has leveraged its monopoly power to further degrade the consumer experience by, among other things, violating user privacy and disregarding data protection to maximize advertising profits, and allowing misinformation and violent or otherwise objectionable content to proliferate on its platform. (JA 106-109, 399-402 (¶¶ 245-255).)

## B.     Procedural Background

### 1.     The States' complaint

To address Facebook's anticompetitive conduct, a coalition of forty-six States, the District of Columbia, and Guam jointly filed the complaint in this action (JA 40-162). The States closely coordinated with the Federal Trade Commission (FTC), which simultaneously filed its own complaint (JA 163-215).

14

The States' complaint included claims for (1) unlawful maintenance of a monopoly in the market for personal social networking services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (2) unlawful acquisitions of Instagram and WhatsApp, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. (JA 110-112 (¶¶ 256-272).)

The complaint sought a declaration that Facebook's conduct violated these laws and an injunction preventing Facebook from (a) continuing to engage in anticompetitive conduct; or (b) making future high-value acquisitions without advance notification to the plaintiff States, or any acquisitions without disclosures to the States equivalent to those required to the federal government under the Hart-Scott-Rodino Act. (JA 113-114). The complaint also sought "such other and further equitable relief" as needed to restore competition and prevent future violations, such as divestiture as appropriate. (JA 114.)

## 2. The district court's dismissal

Facebook moved to dismiss the States' case, and the district court (Boasberg, J.) granted the motion.

*First*, the district court held that laches barred the States' acquisition-based claims under Clayton Act § 7 and Sherman Act § 2. The

district court rejected the States' argument that laches was inapplicable to sovereign States pursuing enforcement actions like this one. (JA 263-267.) Applying the laches doctrine, the court assumed that divestiture of Facebook's acquisitions was the only available relief and "presum[ed]" that such divestiture would substantially prejudice Facebook. (JA 258, 261-263.) The court also found that the States had engaged in "unreasonable delay" as a matter of law. (JA 259-260.)

*Second*, the district court dismissed the remainder of the States' Sherman Act § 2 claim, which focused on Facebook's policies to exploit control of its platform to bury competitors. The court recognized that Facebook's "<u>implementation</u> of [its] policy as to certain specific competitor apps may have violated Section 2," but it found that any such misconduct had ceased and that injunctive relief was therefore unavailable. (JA 218-219, 247-251.) The court further rejected the complaint's allegation that Facebook's 2011 platform policy applied to third-party apps that linked or integrated with competing social networking platforms, finding instead—despite the complaint's allegations (JA 93 (¶ 199))—that the policy was limited to so-called "canvas" apps that ran on Facebook itself. (JA 254-255.) Based on its own view of the facts, the

16

district court concluded that the States failed to state a Section 2 claim. (JA 237-256.)

The district court, however, denied Facebook's motion to dismiss the FTC's parallel action (after permitting the FTC to amend certain allegations related to Facebook's market power). *FTC v. Facebook, Inc.*, No. 20-cv-3590 (D.D.C. Jan. 12, 2022), ECF No. 90 ("FTC Op."). Recognizing that laches does not apply against federal-government enforcers, the district court concluded that the FTC stated a viable claim that Facebook's acquisitions were unlawful. *See id.* at 8-34. But, as in the States' case, the court held that the FTC's platform-related allegations provide no basis for injunctive relief and refused to permit those allegations to proceed to discovery. *See id.* at 34-40.

17

## STANDARD OF REVIEW

This Court reviews the district court's decision to dismiss de novo. *Farrar v. Nelson*, 2 F.4th 986, 988 (D.C. Cir. 2021).[5] In so doing, this Court must "treat[] the complaint's factual allegations as true" and "grant[] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Ralls*, 758 F.3d at 314-15 (quotation marks omitted).

## SUMMARY OF ARGUMENT

I. The district court erred in holding that laches barred the States' acquisition-based claims, for two independent reasons.

A. Laches does not apply at all where, as here, States pursue an enforcement action in the public interest. *See, e.g.*, *Guaranty Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 132-33 (1938). The Supreme Court has explained that this rule is supported by the policy that public rights

---

[5] This Court has not decided what standard of review applies to a laches determination on a motion to dismiss. *See Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010). But, at a minimum, insofar as the district court rejected the States' legal argument that laches does not apply against them, and decided as a matter of law that the complaint's allegations required a laches holding, this Court's review is de novo. *See Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

18

should be preserved, and that government enforcement authorities should not be barred from taking the time needed to enforce those rights. *See id.* That policy applies equally to state enforcers as to federal enforcers, against whom there is no dispute that laches does not apply.

B. Even assuming that laches applied, the district court erred in finding laches at the motion-to-dismiss stage. This Court has recognized that laches "depends largely upon questions of fact" and thus ordinarily should not be resolved on a motion to dismiss. *See Menominee Indian*, 614 F.3d at 532 (quotation marks omitted). The court improperly found that Facebook was prejudiced by the timing of the States' complaint, when the States' complaint provided no allegations to support such a finding, and Facebook offered no proof of prejudice. The court also improperly found that the States had unreasonably delayed their lawsuit, when Facebook itself had concealed its actions from enforcement authorities, and it took time for the anticompetitive nature and harms of its acquisitions to become clear. Barring the States from suit now strips them of critical law-enforcement authority and denies them the flexibility they need to effectively protect consumers and the public interest.

19

II. The district court also erred in dismissing the remainder of the States' monopolization claim, based on Facebook's efforts to "bury" potential competitors through control of its platform. The district court made multiple independent errors in dismissing this claim.

A. The district court disregarded the complaint's allegations by assuming that injunctive relief was unavailable because Facebook had halted its anticompetitive conduct. In fact, the complaint alleges that Facebook's anticompetitive course of conduct and its detrimental effects are ongoing. And even if they were not, injunctive relief would remain available to prevent recurrence of unlawful conduct. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

B. The district court again improperly disregarded the complaint's allegations by assuming contrary characterizations of one of Facebook's key platform-access policies. In assuming that Facebook's policy applied only to "canvas" apps and that the policy did not have its intended effect, the district court failed to give the States "the benefit of all inferences that can be derived from the facts alleged," as it must on a motion to dismiss. *Ralls*, 758 F.3d at 315 (quotation marks omitted).

20

C. The district court erred in construing Facebook's platform-related conduct and applicable antitrust precedents too narrowly.

*First*, the district court improperly evaluated Facebook's platform-related conduct in isolation, rather than as part of a unified course of conduct to maintain its monopoly by "buying or burying" potential competitors. *See, e.g.*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

*Second*, the district court erred in construing Facebook's platform-related conduct as a mere "refusal to deal" with competing firms. The States allege that Facebook has done much more than merely refuse to deal: Facebook has exploited potential competitors' reliance on its platform to harm those competitors in numerous ways—including by imposing anti-competitive conditions on platform access, cutting off competitors, and degrading quality of competitors' content. The Supreme Court and this Court have repeatedly recognized that such purposeful and effective monopolization efforts violate Section 2. *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *Microsoft*, 253 F.3d 34.

21

*Finally*, the district court improperly dismissed the States' claim before the States had an opportunity to prove the unlawfulness of Facebook's course of conduct in the distinctive digital market at issue, and before Facebook offered any facts to support its fact-intensive defenses. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005).

## ARGUMENT

## POINT I

### THE DISTRICT COURT ERRED IN APPLYING LACHES TO DISMISS THE STATES' ACQUISITION-BASED CLAIMS

### A.    Laches Does Not Apply to States Suing to Enforce the Law and Protect Public Rights.

The district court initially erred in applying laches against the States at all. As their complaint makes clear, the States "bring this action, by and through their Attorneys General, in their sovereign capacities" to enforce the law, "and in their quasi-sovereign capacities to safeguard the wellbeing of the states and their residents." (JA 49 (¶ 17).) Like all sovereign law enforcers—"state or national"—the States here are "exempt from the consequences of [their] laches." *Guaranty Tr.*, 304 U.S. at 132-33.

22

As the Supreme Court has explained, this rule is supported by the "great public policy" to preserve and protect the public rights that governmental enforcement actions advance. *Id.* at 132 (quotation marks omitted). The law thus presumes that government enforcers are "always busied for the public good" and should not be prevented from taking the time needed to pursue that public good through litigation. *See* 1 William Blackstone, *Commentaries* \*247 (Lewis ed. 1902) (1765). And "our everchanging, increasingly complex society" has only "place[d] even more demands on the limited resources of our state government[s]," making the need for flexibility in the timing of enforcement actions all the more important. *Ohio, Dep't of Transp. v. Sullivan*, 527 N.E.2d 798, 800 (Ohio 1988).

Accordingly, courts have regularly held that laches and other time bars are inapplicable to States seeking to protect public rights under state and federal laws—including federal antitrust laws, as in this case. *See, e.g.*, *Illinois v. Kentucky*, 500 U.S. 380, 388 (1991) (federal common law); *United States v. Letter from Alexander Hamilton to the Marquis de Lafayette Dated July 21, 1780*, 15 F.4th 515, 526 (1st Cir. 2021) (federal civil forfeiture); *United States v. Mottolo*, 605 F. Supp. 898, 909 (D.N.H. 1985) (federal environmental law); *Massachusetts ex rel. Bellotti v. Russell*

23

*Stover Candies, Inc.*, 541 F. Supp. 143, 144-45 (D. Mass. 1982) (federal antitrust laws); *Washington v. LG Elecs., Inc.*, 375 P.3d 636, 641-44 (Wash. 2016) (state antitrust laws).

The district court correctly acknowledged that laches is inapplicable against the federal government suing to enforce public rights (JA 265-266), but erroneously applied laches against the States suing in the same capacity (JA 263-267). The court reasoned that the States seek relief here under Section 16 of the Clayton Act, 15 U.S.C. § 26, a provision that also applies to private plaintiffs, and thus should be treated the same as private plaintiffs for purposes of applying laches.

That reasoning is fundamentally flawed. The inapplicability of laches here derives not from the substantive source of the States' claims, but instead from the capacity in which the States have sued—as sovereigns seeking to enforce the law and protect public rights. This principle explains why courts have refused to apply laches to the States across a broad range of claims under both state and federal laws. See *supra* at 23-24 (citing cases). The inapplicability of laches against the federal government similarly is not unique to the antitrust laws, but rather derives from the capacity in which the federal government sues to protect public

24

rights, regardless of the claim pursued. *See, e.g.*, *Costello v. United States*, 365 U.S. 265, 281 (1961) (listing cases). Here, there is no dispute that the States are exercising their sovereign law-enforcement authority to protect public rights; indeed, the district court recognized as much in finding that the States have standing to sue as parens patriae precisely because they are suing "for the benefit of the public." (*See* JA 236-237.)

Contrary to the district court's reasoning, Section 16 supports the inapplicability of laches here. Section 16 is explicit that plaintiffs suing under the statute are entitled to relief "under the same conditions and principles" as relief "is granted by courts of equity." 15 U.S.C. § 26. And a settled principle of equity is the rule that laches does not apply against sovereign States enforcing public rights. See *supra* at 22-24.

Indeed, Congress would have needed to use "exceedingly clear language" if it wished to deprive States of a traditional sovereign protection like the inapplicability of laches, particularly when that same protection remains available to the federal government. *See United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020). "This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional

scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). Because Congress has included no plain statement stripping the States of their traditional protection from laches in Section 16 or anywhere else in the antitrust laws, the States retain that protection.

The district court erred in suggesting (JA 266) that States are no differently situated from private plaintiffs because private plaintiffs too can bring antitrust suits in the public interest. Private plaintiffs—unlike the federal or state government—may be expected to sue (and likely would have standing to sue) only when their own private interests are at stake. *See United States v. Borden Co.*, 347 U.S. 514, 518 (1954). Protection of these private interests may also be in the public interest. But there is not the same inherent relationship to the public interest as when state enforcers sue subject to the "safeguards of the public-interest standards and expertness which presumably guide the government when it is a plaintiff." *International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 926-27 (9th Cir. 1975), *disapproved on other grounds by California v. American Stores Co.*, 495 U.S. 271 (1990).

26

In concluding that laches applies to the States here, the district court improperly relied (JA 263-264, 266) on two cases that did not directly address the issue. First, *American Stores* expressly declined to address laches because that issue was "not presented in th[at] case." 495 U.S. at 296. Only Justice Kennedy's concurrence (joined by no other justice) suggested that the lower courts could consider on remand whether laches *might* apply to the state plaintiff—and his opinion did not grapple with the rule that laches does not apply against government enforcers. *See id.* at 298. And while the district court in *Puerto Rico v. Carpenter Co.* held that Puerto Rico's claim was barred by laches, that court never considered the threshold question of whether laches could apply to a government plaintiff in the first instance. *See* 442 F. Supp. 3d 464 (D.P.R. 2020).

The district court also erred in relying (JA 265) on an amicus brief filed by the federal government in earlier antitrust litigation involving Microsoft.[6] That litigation did not involve any laches defense, and thus the amicus brief did not say or imply that States should be subject to

---

[6] *See* Mem. Amicus Curiae of the United States, *New York v. Microsoft Corp.*, No. 98-cv-1233 (D.D.C. Apr. 15, 2002), https://tinyurl.com/9rjxj8jh.

laches. Insofar as the brief made any claim related to the asserted primacy of the federal sovereign in enforcing federal antitrust laws, that claim was limited to the "unique" context the brief emphasized (at 2): there, the federal government and some States had already settled with Microsoft, while other States pursued additional relief. The federal government claimed (at 4) only that the views of the States that continued to litigate should not be given "equal footing" with the shared views of the federal government and the States that agreed with the federal government. No such circumstances are presented here, where the federal government and all the state plaintiffs are coordinating in a common effort to safeguard public rights.

**B.     Assuming That Laches Can Apply Against the States, the District Court Misapplied the Doctrine to Bar the States' Claims Here.**

Even if laches could be applied against the States, the district court erred in finding that laches applies here. As this Court has held, because laches "involves more than the mere lapse of time and depends largely upon questions of fact," "a motion to dismiss generally is not a useful vehicle for raising" laches. *Menominee Indian*, 614 F.3d at 532 (quotation marks omitted). Moreover, a defendant asserting the affirmative defense

28

of laches bears the burden of establishing that the equities support it. *See Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005).

To satisfy its burden, the defendant must prove two distinct elements: "inexcusable delay" and "undue prejudice." *Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990). In assessing whether these factors are satisfied, a court must take into account the nature and motivations of the plaintiff. Here, the plaintiffs are States suing to "protect the public interest," *Borden*, 347 U.S. at 518-19, rather than private competitors principally seeking to vindicate private harms. In other words, even if the special status of States is not enough to preclude laches altogether (see *supra* at 22-28), it should nonetheless weigh heavily in the equitable analysis. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (States are "entitled to special solicitude in our standing analysis").

Here, particularly in light of the States' special status, the district court erred in finding that Facebook satisfied its burden of establishing laches at this preliminary stage of the litigation.

29

**1. The district court improperly "presumed" prejudice to Facebook without adequate factual basis.**

Facebook failed to satisfy its burden of establishing prejudice—a defect that alone is fatal to its laches defense. *See Daingerfield Island*, 920 F.2d at 38. Nothing in the States' complaint established that Facebook would suffer prejudice from the timing of this litigation. And Facebook's motion-to-dismiss papers identified no allegations by the States or any other evidence to support a claim of prejudice. Indeed, Facebook offered *only* the conclusory assertion that adjudicating the States' challenge to its Instagram and WhatsApp acquisitions would necessarily be prejudicial because "Facebook has spent many years growing and investing in" those apps (Dkt. 114-1, at 12[7]) and "has operated those businesses for years as part of a unified company" (Dkt. 123, at 12). But the States' complaint did not specify—and Facebook never explained—what it means for the services to be "unified," how much Facebook has spent on "growing and investing in" those apps, or what, if any, concrete harm would result

---

[7] District court docket numbers refer to the docket in case number 20-cv-3589 (D.D.C.).

from any relief sought by the States. Facebook's bare assertions do not support a finding of prejudice at this stage.

The district court's conclusion to the contrary relied on several legal errors and improperly construed the States' allegations in Facebook's favor, when the procedural posture here required the opposite. *First*, the district court erred in applying a "presumption" of prejudice based on the mere fact that the States filed their lawsuit more than four years after Facebook acquired Instagram and WhatsApp. (JA 261.) Such a presumption conflicts with this Court's express holding that "a finding of laches cannot rest simply on the length of delay." *Daingerfield Island*, 920 F.2d at 37. Instead, the party asserting laches must offer "proof of . . . prejudice." *Pro-Football*, 415 F.3d at 47 (quotation marks omitted). Rather than following these precedents, the district court based its presumption of prejudice on two out-of-circuit cases that involved private plaintiffs—not States suing to enforce public rights. *See International Tel. & Tel. Corp.*, 518 F.2d at 926; *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982). Those decisions provide no reason to depart from this Court's settled precedent.

31

*Second*, the district court's concern about prejudice stemmed entirely from its assumption that the only available remedy for the States' acquisition-based claims was divestiture of Instagram or WhatsApp. (*See* JA 261-263.) But concerns about the burdens of future relief are premature at the motion-to-dismiss stage, when liability has not yet been determined and no facts have even been presented to determine whether any particular form of relief would prove unduly burdensome. *See Microsoft*, 253 F.3d at 101. And although divestiture is one common remedy for unlawful acquisitions, the district court erred in assuming at this stage that divestiture would be the *only* available remedy, and that it would be unduly prejudicial to Facebook.

Clayton Act § 16, which defines the injunctive relief available to the States here, should be applied "with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130-31 (1969) (quotation marks omitted). Thus, although divestiture is an available remedy under Section 16, other remedies are available as well. *See, e.g.*, *id.* at 129-33 (approving non-divestiture injunctive relief).

32

The States' complaint specifically seeks, in addition to divestiture, other forms of injunctive relief, such as limitations on future acquisitions (e.g., reporting to the States before allowing future large acquisitions to proceed). (JA 113-114.) And the complaint also requests "other and further equitable relief as th[e] Court may deem appropriate" to avoid future anticompetitive effects. (JA 114.) Such relief might include, for instance, forward-looking conditions such as firewalls, API-access requirements, restrictions on data usage, or other remedies apart from divestiture. Facebook has not shown (and the district court made no finding) that any such prospective relief would be prejudicial as a matter of law. *See Gaudreau v. American Promotional Events, Inc.*, 511 F. Supp. 2d 152, 159 (D.D.C. 2007) ("laches generally does not apply to bar claims for prospective injunctive relief") (citing cases).

*Third*, the district court erred in finding (JA 261) that the States' complaint confirms the existence of prejudice. None of the allegations the district court cites (*see* JA 261) establishes as a matter of law that Facebook or its shareholders were prejudiced by the timing of the States' complaint—i.e., that "but for" the later timing of the complaint, Facebook and its shareholders would have been in a better position, *see Gull*

33

Material Under Seal Deleted

*Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982). For instance, the district court cites an allegation that Facebook CEO Zuckerberg once sent an email suggesting that Facebook might "integrate [Instagram's] products with ours." (JA 261 (quoting JA 72 (¶ 115)).) ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ (JA 367-368 (¶¶ 125-126).) ████████ Facebook declined to take actions to integrate and monetize WhatsApp "despite having over six years to formulate, develop, and implement a plan to do so." (JA 86-87, 379-380 (¶¶ 171, 173-175).)

In short, the complaint alleges that Facebook acquired Instagram and WhatsApp to stifle competition from them, not to invest in them and integrate them with Facebook. Indeed, the complaint indicates that the passage of time has *amplified* the anticompetitive effects of Facebook's acquisitions: having eliminated competition through the acquisitions, Facebook has cemented its monopoly power, collected more user data, and ultimately boosted profits from ad sales. (*See* JA 103-106, 396-399

(¶¶ 235-244).) There is no prejudice supporting laches where, as here, the passage of time "worked to [the defendant]'s benefit, not to his detriment," in furthering its monopoly maintenance. *Costello*, 365 U.S. at 282.

The summary-judgment cases on which the district court relied (JA 261-262) are inapposite. For instance, in *Pro-Football, Inc. v. Harjo*, it was "*undisputed*" that the party asserting laches "substantially expanded" investment in a trademark while the other party delayed in filing suit, and the expanded investment would be wasted because of the delay if the other party prevailed and the mark was cancelled. *See* 567 F. Supp. 2d 46, 61 (D.D.C. 2008) (emphasis added), *aff'd in part*, 565 F.3d 880 (D.C. Cir. 2009). By contrast, Facebook has made no showing of similar wasted investment here, and any assertion by Facebook that it is similarly prejudiced is, at a minimum, heavily disputed.

*Finally*, the district court's concern about prejudice is particularly dubious given that the FTC's parallel lawsuit challenging Facebook's acquisitions is proceeding, and the FTC is seeking all the relief (including divestiture) that the States request here. *See* FTC Op., at 6-7. Against that backdrop, it is difficult to see how the States' parallel claims cause any additional prejudice.

### 2.    The district court improperly assumed that the States unreasonably delayed in filing their complaint.

Facebook's failure to prove prejudice alone precludes a laches defense. *See Daingerfield Island*, 920 F.2d at 38 (reversing laches finding despite unreasonable delay). But the district court also erred in assuming that the States unreasonably delayed in filing their complaint, a separate requirement for a laches defense, *id.* at 37. In so concluding, the district court failed to give proper weight to the distinct nature of the States and the unique public-interest factors driving their enforcement decisions—factors that have no applicability to private plaintiffs.

Here, the States reasonably filed suit when Facebook's anticompetitive course of conduct—of which the Instagram and WhatsApp acquisitions were early manifestations—became clear. Two pieces of context are important.

First, at the time of Facebook's Instagram and WhatsApp acquisitions, the market for personal social networking services was changing due to widespread adoption of mobile devices. (*See, e.g.*, JA 50-51, 58-61, 68-69, 351-354 (¶¶ 28, 58-72, 100-104).) Anticompetitive effects of acquisitions in such developing markets are likely to be less clear to enforcement authorities than to sophisticated incumbent companies like Facebook,

36

which have a "privileged view" of the market. *See* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. Pa. L. Rev. 1879, 1905-06 (2020). Here, the anticompetitive nature of Facebook's acquisitions only became apparent to the States through later-emerging evidence that the Instagram and WhatsApp acquisitions were early pieces of a broader anticompetitive course of conduct to buy or bury potential competitors (*see, e.g.*, JA 88-89 (¶¶ 181-185)), including documents like those where Facebook leadership admitted the anticompetitive goals of its acquisitions (*see, e.g.*, JA 74-78, 80-85, 88-89, 368-370).

Second, Facebook's *active misrepresentations* of its anticompetitive intent at the time of the acquisitions hindered the States' ability to identify the anticompetitive nature of the acquisitions. As the complaint explains, Facebook initially "disavow[ed]," to the FTC, to European regulators, and to WhatsApp, any plans to use WhatsApp user data to promote Facebook. (JA 87 (¶ 176).) But Facebook later reversed course and began exploiting WhatsApp user data to support its ad-targeting business. (*See* JA 87

37

(¶¶ 176-177).)[8] Facebook also "took great pains" to avoid negative publicity of its anticompetitive actions that might attract attention of enforcement authorities. (JA 87-88 (¶ 178).) Facebook's concealment of the anticompetitive purpose and effects of its acquisitions understandably delayed the States' enforcement action.

Case law further supports the reasonableness of the States' approach. As the Supreme Court has explained, the rule is not "sue soon, or forever hold your peace." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682-83 (2014). Rather, courts have recognized that plaintiffs may wait to challenge acquisitions until they can determine if the acquisitions threaten competitive harm. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 718 (4th Cir. 2021) (citing *Petrella*, 572 U.S. at 682-83). That determination may not come until, as in this case, the "cumulative impact" of the acquisitions as part of a larger course of conduct becomes clear. *Cf. Loumiet v. United States*, 828 F.3d 935, 948 (D.C. Cir. 2016)

---

[8] The European Union subsequently fined Facebook €110 million for its misrepresentations. *See* Press Release, Eur. Comm'n, *Mergers: Commission Fines Facebook €110 Million for Providing Misleading Information About WhatsApp Takeover* (May 18, 2017), https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1369.

(statute of limitations tolled until cumulative impact of conduct reveals its illegality).

On this front, the district court erred by failing to take appropriate account of the special status of the States. State enforcers are subject to different pressures and bear different responsibilities from private plaintiffs in deciding whether and when to bring an enforcement action. Unlike private plaintiffs, State enforcers have no incentive to sue except to "protect the public interest." *Borden*, 347 U.S. at 518-19. See *supra* at 26. And it is not only reasonable but responsible for law enforcers to be judicious in taking the time to fully evaluate the danger to competition that a company poses before bringing the full weight of their authority upon a defendant.

The district court here penalized the States for taking the time needed to fully evaluate the danger to competition that Facebook posed, see through Facebook's own misrepresentations (see *supra* at 37-38), come to agreement as a bipartisan coalition of forty-eight States, and coordinate with the FTC. But such a rule creates incentives for state enforcers to rush to court before the public interest in pursuing an enforcement action is clear—a result that harms rather than serves the public interest.

39

*See* Hemphill & Wu, *supra*, at 1905-06. Moreover, under the district court's rule, if, as in this case, the States do not rush to court, they lose law-enforcement authority critical to curtailing misconduct of powerful monopolists like Facebook.

In nevertheless applying laches against the States, the district court misunderstood the States' argument. The States do not argue that the Instagram and WhatsApp acquisitions are subject to challenge now because the "acquisitions themselves are 'ongoing'" or because unrelated, more recent actions by Facebook "open the acquisitions to renewed challenge." (JA 267.) Rather, the States argue that the acquisitions were early steps in a course of conduct that is subject to challenge now because that course of conduct remains ongoing. And they argue that the acquisitions also are subject to challenge now because the States only recently gained sufficient evidence of the cumulative anticompetitive effects of Facebook's acquisitions (as part of its larger course of conduct) to merit

enforcement action. Both facts show that the lapse of time between these acquisitions and the filing of the complaint was reasonable.[9]

The district court's finding of unreasonable delay is also flawed because it depends on a critical unsupported assumption. (JA 260-261.) The court assumed that the States had ample notice well before filing the complaint that the Instagram and WhatsApp acquisitions had an anti-competitive purpose and effect, merely because the acquisitions were publicly announced and the subject of earlier FTC investigations. But those facts did not give the States sufficient evidence of the acquisitions' anticompetitive nature to responsibly bring an enforcement action— particularly when Facebook misrepresented its anticompetitive intent. See *supra* at 36-39. In addition, the States did not have the same access to information as the FTC before the acquisitions: parties are not obligated to make premerger filings with the States as they are with the federal government under the Hart-Scott-Rodino Act. *See* 15 U.S.C. § 18a.

---

[9] The district court was also incorrect to suggest (*see* JA 261, 268-269, 282) that the States failed to argue below that they were unable to pursue their claims earlier. The States explained that the timing of their suit was reasonable because (among other reasons) "the passage of time made clear" the anticompetitive effects of Facebook's acquisitions. (*See* Dkt. 122, at 13 (citing complaint).)

41

The district court's further observations that the States alleged that Facebook was "'the dominant player'" in personal social networking services even before the acquisitions (JA 260 (quoting JA 60 (¶ 68))), and that "'some analysts'" believed at the time of the WhatsApp acquisition that it had an anticompetitive intent (JA 261 (quoting JA 85-86 (¶ 170))), are beside the point. That Facebook was the dominant player does not itself provide sufficient basis to bring an antitrust enforcement action. And what "some analysts" believed says nothing about whether the States, as law enforcers, had sufficient awareness of the anticompetitive nature of Facebook's acquisitions to responsibly file suit at the time.

## POINT II

### THE DISTRICT COURT ERRED IN DISMISSING THE STATES' PLATFORM-BASED CLAIM

The district court also erred in dismissing the portion of the States' Sherman Act § 2 claim based on Facebook's "burying" potential competitors, including by conditioning and selectively cutting off third-party developers' access to its platform. After first broadly partnering with third-party app developers via mutually beneficial APIs, Facebook shifted gears and adopted several policies to quash competitors and potential

42

competitors and thus maintain its monopoly. Among other actions, Facebook implemented a policy to forbid access to its platform for any apps that supported competing social network platforms by "link[ing] or integrat[ing]" with them. (JA 93 (¶ 199).) Facebook also cut off access for any apps that posed a competitive threat by "replicat[ing] [Facebook's] core functionality." (JA 93 (¶¶ 201-202).) And Facebook degraded quality for apps it viewed as potential competitors. (JA 95, 99-101, 392-394 (¶¶ 205, 223, 227-228).) These platform-based "burying" policies complemented Facebook's simultaneous efforts to eliminate other potential competitors by buying them outright. (*See, e.g.*, JA 69-89, 362-382 (¶¶ 105-185).)

Facebook's alleged course of conduct violates Section 2 because it reflects "'the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 50 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). In nevertheless dismissing the States' Section 2 claim, the district court committed several fundamental errors, each of which independently supports reversal.

43

**A.    The District Court Wrongly Concluded That Injunctive Relief Was Unavailable for the Alleged Platform-Related Conduct.**

**1.    The district court had no basis for finding that Facebook ceased its unlawful conduct when the complaint alleges otherwise.**

Although the district court recognized that Facebook previously engaged in platform-related conduct that "may have violated Section 2" (JA 218-219), it found that Facebook ceased this unlawful conduct by 2018, and thus injunctive relief was not available. (JA 248-249.) But the States' complaint does not allege that Facebook's conduct ceased by 2018. And crediting at this stage Facebook's claim that it no longer engages in platform-related misconduct is particularly inappropriate given the States' specific allegations of Facebook's history of concealing the anticompetitive purpose of its API restrictions. (*See, e.g.*, JA 98-99 (¶¶ 218-219 (discussing Facebook's pretextual justifications for cutting off API access to two apps)).) On a motion to dismiss, "the relevant facts are those alleged in the complaint." *Hurd v. District of Columbia, Gov't*, 864 F.3d 671, 675 (D.C. Cir. 2017). Facebook is free to dispute those allegations at a later stage, but the district court was not entitled to reject the States' claim of ongoing violations at the motion-to-dismiss stage.

44

Rather than accepting the States' allegations, the district court based its finding that Facebook had ceased its unlawful platform-related conduct by 2018 on allegations that appeared in the FTC's *separate* complaint. (JA 231, 254-255.) First, those allegations are not referenced in, or a predicate for, the States' complaint, and cannot properly be read into it. Second, the FTC's allegations do not support the district court's finding. The FTC alleged that, in 2018, Facebook purported to "suspend" its earlier policy that had conditioned access to its APIs on apps not replicating Facebook's "core functionality." (JA 206 (¶¶ 148-149).) But Facebook's only reason for suspending the policy was to avoid antitrust scrutiny from public disclosure of documents "highlighting Facebook's anticompetitive conduct." (JA 206 (¶¶ 148-149).) Accordingly, as the FTC alleges, the change "did not represent a disavowal by Facebook of the underlying anticompetitive conduct." (JA 206 (¶ 149).) The FTC's allegations thus do not support the district court's finding that Facebook permanently ceased its unlawful conduct, even assuming that those allegations could be considered here.

### 2.  Injunctive relief would remain available even if Facebook had in fact halted anticompetitive platform-related conduct.

Regardless of Facebook's alleged cessation of certain conduct, the district court was wrong to conclude at the motion-to-dismiss stage that injunctive relief was unavailable.

*First*, "an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to their old ways." *Allee v. Medrano*, 416 U.S. 802, 810-11 (1974) (quotation and alteration marks omitted). A request for prospective injunctive relief thus remains appropriate unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See Friends of the Earth,* 528 U.S. at 189 (quotation marks omitted). Here, nothing in the States' complaint supports the district court's assumption that Facebook will not again engage in anticompetitive platform-related misconduct. Indeed, the risk of such recurrence is particularly high for two reasons. For one thing, Facebook (purportedly) suspended its anticompetitive policy only to avoid antitrust scrutiny. See *supra* at 45. In addition, Facebook has not acknowledged culpability for its past misconduct.

Courts recognize that such circumstances amplify the likelihood of recurrence necessitating an injunction. *See, e.g.*, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) (likelihood of recurrence where subject of enforcement action ceased wrongdoing only when it faced investigative scrutiny); *SEC v. First Am. Bank & Tr. Co.*, 481 F.2d 673, 682 (8th Cir. 1973) (same where subject insists its actions were legitimate). In fact, the FTC complaint on which the district court improperly relied specifically alleges that Facebook "is likely to reinstitute" its suspended policy, absent injunctive relief. (JA 206 (¶ 149).) At minimum, there is a deeply disputed factual question that cannot be resolved at the motion-to-dismiss stage about whether Facebook can be expected to engage in anticompetitive platform-related conduct in the future. The district court should not have resolved that question against the States at this preliminary stage.

*Second*, even if it were "absolutely clear," *Friends of the Earth*, 528 U.S. at 189, that Facebook would not again engage in anticompetitive platform-related conduct, its past conduct would still warrant prospective injunctive relief because of its ongoing anticompetitive effects. The district court recognized that the States "have pleaded the existence of 'an ongoing

injury'—*i.e.*, 'continuing, present adverse effects'"—from Facebook's plat-form conduct, including "blunt[ing] the growth of existing competitors," "deter[ring] other potential competitors from entering Facebook's market, and even 'discourag[ing] outside investment' in new firms." (JA 249 (citing JA 90, 96, 106, 389 (¶¶ 187, 211, 246)).)[10]

Upon proof of such ongoing adverse effects, the States would be entitled to a remedy, irrespective of whether Facebook has terminated the unlawful policy that generated them. Antitrust remedies are flexible enough not only to halt past and future anticompetitive conduct, but also to "'deny to the defendant the fruits of its statutory violation.'" *Microsoft*, 253 F.3d at 103 (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). In other words, even if misconduct has ended and is not likely to recur, relief is available if it "represents a reasonable method of eliminating *the consequences* of the illegal conduct." *National Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978) (emphasis

---

[10] By contrast, in the cases on which the district court relied (JA 249-250), the plaintiffs made "no allegation" of any "continuing, present adverse effects" or "likely future injury" remediable by an injunction. *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1272 (11th Cir. 2015); *accord In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 35 (D.D.C. 2008); *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 18-19 (D.D.C. 2004).

added). Indeed, "[i]t would be a novel, not to say absurd, interpretation" of the Sherman Act to permit a monopolist to retain benefits of monopolization it had "no right to acquire," simply because it is no longer actively imposing an anticompetitive restraint. *See Ford Motor Co. v. United States*, 405 U.S. 562, 574 n.9 (1972) (quotation marks omitted); *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 488 (9th Cir. 2021) (antitrust defendant liable for "continuing antitrust injuries from anticompetitive changes to market structure" "even after the last proven date of the violative conduct").

In light of the flexibility of antitrust remedies, the district court erred in assuming at this early stage that "there is nothing the Court could order Facebook to do" to remedy the ongoing effects of Facebook's platform-related misconduct. (JA 249-250.) To be sure, some competitors that Facebook subjected to its API cutoffs have since become "defunct." (JA 250.) But Facebook's past success in eliminating competitive threats only underscores the need for injunctive relief to protect future compe-

tition. Such relief could include, for instance, prohibiting future anti-competitive conditions on API access.[11] At a minimum, it is premature to rule out the availability of *any* possible remedy (*see* JA 113-114).

## B.  The District Court Erroneously Disregarded the States' Allegations Regarding the Scope and Effect of Facebook's Platform Policy.

In dismissing the platform-related claims, the district court improperly found that one of Facebook's key platform policies was more limited in its objectives than alleged by the complaint, and in any event failed to achieve those objectives. Once again, the court had no basis for rejecting the complaint's allegations at the motion-to-dismiss stage. The court found that Facebook's platform policy restricting apps from linking or integrating with competing social networks was limited to so-called "canvas" apps—i.e., apps that operate exclusively within the Facebook platform—and did not cover apps operating outside the platform. (JA 254-255.) The court further found that this policy was merely "aimed at" forbidding access to its platform for apps that linked or integrated with competing

---

[11] *See* Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 2001-39 (2021) (discussing potential remedies against dominant platforms).

social networks and did not in fact achieve its aims. (JA 254.) Based on these assumptions, the court concluded (JA 255-256) that Facebook's policy did not prevent *all* app developers from doing business with competitors as a condition of accessing Facebook's APIs, and thus did not violate Sherman Act § 2. The district court's fact-finding at this early stage was improper, as was the legal conclusion it reached.

*First*, the district court failed to give the States "the benefit of all inferences that can be derived from the facts alleged," as it must in evaluating a motion to dismiss. *Ralls*, 758 F.3d at 315. As an initial matter, the States' complaint nowhere suggests that Facebook's policy prohibiting linking and integrating with competing social networks was limited to "canvas" apps. The district court relied for this point on the FTC's separate complaint, which pleaded that the policy in question applied to "Apps on Facebook." (JA 254.) Without citation, the court reasoned that "it is clear" that "Apps on Facebook" refers only to "canvas" apps. (JA 254-255.) But, as noted (*supra* at 45), the States are not bound by the allegations in the FTC complaint. Moreover, there is no basis for such a narrow interpretation, when the States specifically alleged that the policy applied to "*any*

51

apps that linked or integrated with competing social platforms," not just "canvas" apps. (JA 93 (¶ 199 (emphasis added)).)

In addition, the district court's view that the policy was unsuccessful in achieving its goal contradicts the complaint's clear implication that Facebook's policy was not only "aimed at" forbidding access to its platform for apps that linked to or integrated with competing platforms, but also was successful in achieving that goal. That inference naturally follows from the complaint's allegations, including that Facebook cut off many apps pursuant to its platform policies and that Google's competing platform, Google+, failed to gain traction after Facebook's policy was implemented—just as Facebook intended. (*See* JA 93-102, 388-395 (¶¶ 199-200, 206-231).) The district court's assumption that Facebook's policy was wholly ineffective is thus contrary to the complaint's allegations and improper at this early stage.

*Second*, even if the policy were as limited in scope and effect as the district court assumed, it still could violate Section 2. Facebook's policy need not have precluded *all* apps from dealing with Facebook's rivals in order to be unlawful. "The test is not total foreclosure," but rather whether the challenged policy has "a significant effect in preserving [the

52

monopolist's] monopoly." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005). A monopolist need not bar all rivals "from all means of distribution" in order to violate Section 2; the monopolist need only bar rivals from *some* meaningful means of distribution, e.g., "the cost-efficient ones." *Microsoft*, 253 F.3d at 64. And these questions about the degree of a policy's anticompetitive effects are inherently factual, and thus should not be decided at this stage. See *infra* at 67-69.[12]

## C.    The District Court Too Narrowly Construed Both the Alleged Course of Conduct and Governing Antitrust Precedents.

The errors described above, on their own, warrant reversal of the district court's dismissal order. In addition, in characterizing and evaluating Facebook's conduct, the district court made further errors of fact and law that provide independent alternative grounds for reversal. Specifically, the district court wrongly assumed that Facebook pursued a mere "policy of refusing to provide API access to its competitors," and

---

[12] For similar reasons, the district court erred in its conjecture (JA 255) that canvas apps could circumvent Facebook's policy by building alternate versions of their apps for rival platforms. The complaint provides no basis for concluding that such parallel app building would be feasible, much less cost-efficient, for nascent apps.

erroneously interpreted antitrust precedents in holding that Facebook's policy "does not itself violate Section 2" because firms have a "right to refuse to deal with other firms." (JA 238-239 (emphasis omitted).) Contrary to the district court's ruling, the States alleged more than a policy of refusing access to competitors: they alleged a unified, ongoing course of exclusionary conduct by Facebook to maintain its monopoly power through a calculated "buy or bury" strategy to crush potential competition. (*See, e.g.*, JA 45-46, 67-69, 93-94, 110 (¶¶ 4-6, 99, 104, 199-204, 256-262).) That course of conduct violates Section 2 because Facebook has not simply "refused to deal" with potential competitors, but rather has willfully eliminated competition by either buying potential competitors or burying them by exploiting reliance on its platform in a number of ways, including by imposing anticompetitive conditions on third parties with which it continued to deal. *See, e.g.*, *Microsoft*, 253 F.3d at 50, 58. The Supreme Court has recognized that a monopolist violates Section 2 where, as here, it maintains its monopoly through a combination of acquisitions that "eliminated any possibility of an outbreak of competition" from the acquired firms, and complementary exclusionary practices restraining remaining potential competitors. *See Grinnell*, 384 U.S. at 576.

54

In concluding that Facebook's platform-related conduct could not violate Section 2, the district court thus erred in: (1) construing Facebook's platform-related conduct in isolation, rather than as part of a unified course of conduct; (2) interpreting Facebook's platform conduct as a lawful refusal to deal; and (3) prematurely dismissing the States' allegations before allowing development of the facts of the distinct course of conduct and market at issue.

### 1. The district court improperly evaluated Facebook's platform-related conduct in isolation, rather than as part of a unified course of conduct.

The district court erred in isolating Facebook's platform-related conduct, rather than considering it in the context of Facebook's broader buy-or-bury course of conduct, including its anticompetitive acquisitions. (JA 237-256.)

This approach violates established antitrust law requiring that courts consider whether an antitrust defendant's entire course of conduct violated Section 2. Because a monopolist's anticompetitive policy may manifest in a variety of different actions, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each,"

55

*Continental Ore*, 370 U.S. at 699; *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together"); *City of Anaheim v. Southern Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

Here, the nature and effect of Facebook's individual alleged exclusionary acts cannot be properly evaluated without understanding them as mutually reinforcing parts of a single-minded scheme of monopoly maintenance. In CEO Zuckerberg's words, Facebook aimed to "build a competitive moat" around Facebook in the personal social networking market, by either buying or burying any third party that threatened to compete. (JA 46 (¶ 5).) Buying and burying have been two sides of the same coin, working together to eliminate competition. For example, the complaint alleges that Facebook convinced Instagram to accept its acquisition offer largely by exploiting its growing reputation for burying competitors it did not acquire. An Instagram investor who knew Zuckerberg well warned Instagram's CEO that Zuckerberg likely would "go into

destroy mode"—i.e., find a way to "bury" Instagram through Instagram's reliance on Facebook's platform—if Instagram declined Facebook's acquisition offer. And Instagram was so reliant on access to Facebook's platform that it felt compelled to sell. (JA 73-74 (¶¶ 120-121).) In other instances where Facebook's overtures to acquire apps were unsuccessful, Facebook did decide to cut off their access to Facebook's platform in retaliation—confirming the unitary nature of Facebook's "buy or bury" strategy. (JA 95-96, 388-389 (¶¶ 208-210); *see also* JA 76, 369 (¶¶ 132-133).) Each acquisition and exclusionary act thus "reinforced the exclusionary effect" of the others, *LePage's*, 324 F.3d at 162, collectively "sen[ding] a message" that Facebook will not tolerate challenges to its dominance, and thereby chilling competition, innovation, and investment (JA 102 (¶ 231); *see also, e.g.*, JA 45-46, 90 (¶¶ 4-6, 186-187)).

Contrary to the district court's concern (*see* JA 278-280), this approach does not impermissibly aggregate otherwise innocent actions under some disfavored "monopoly broth" framework. The States' complaint alleges the anticompetitive purpose and effect of each of Facebook's individual exclusionary acts (*see, e.g.*, JA 70-89, 95-102, 388-395 (¶¶ 107-180, 184, 207-231)). But the anticompetitive nature of each act "cannot

be separated" from those of the larger course of conduct; instead, evaluating the scheme as a whole provides critical context for understanding both Facebook's broader objective to quash competition and the manner in which successive individual actions reinforced the anticompetitive impact of Facebook's monopolistic aims. *See LePage's*, 324 F.3d at 162; *see also City of Anaheim*, 955 F.2d at 1376 (weighing "synergistic effect" of elements of anticompetitive scheme (quotation marks omitted)). The district court's one-at-a-time analysis of Facebook's anticompetitive acts thus disregards the complaint's allegations and violates the fundamental requirement that a defendant's exclusionary acts are considered as a whole, not in isolation.

2. **The district court erred in construing Facebook's platform-related conduct as a mere refusal to deal that could not give rise to antitrust liability as a matter of law.**

The district court also erred in assuming (JA 244-246) that Facebook's platform-related conduct constitutes a mere unilateral refusal to deal that is exempt from the antitrust laws. For a number of reasons, that framing does not accurately characterize the complaint's allegations about Facebook's conduct.

58

*First*, the complaint alleges anticompetitive platform-related conduct that the district court did not—and could not—construe as a "refusal to deal." For instance, the complaint alleges that Facebook exploited its platform control to degrade the functionality and distribution of rivals' content, including by covertly suppressing content linked to Phhhoto when that app was deemed to pose a competitive threat. (*See, e.g.*, JA 95, 99-101, 392-394 (¶¶ 205, 223, 227-228).) The competitive injury from such conduct does not stem from Facebook refusing to deal with a rival; it stems from affirmative actions to harm potential rivals. But the district court simply ignored these allegations and focused only on Facebook's platform-access policies. (JA 237-256.)

Similarly, the district court disregarded the complaint's allegations that Facebook did not simply refuse to deal with rival app developers, but also leveraged its APIs to induce app developers with which it did deal to refrain from taking actions that might pose a competitive threat. (*See, e.g.*, JA 93-94, 102 (¶¶ 199-202, 231).) This anticompetitive conditioning goes beyond a simple decision not to transact with others and instead imposes constraints that affect the conduct of firms in an ongoing relationship with Facebook—for instance, by requiring app developers to

59

agree not to integrate with or otherwise support a competing platform, or forbidding them from competing with Facebook directly by "replicat[ing] [Facebook's] core functionality." (*See* JA 93-94 (¶¶ 199-202).)

Such affirmative, anticompetitive restraints on the conduct of third parties extend a monopolist's reach beyond a unilateral decision not to engage in a transaction and violate Section 2. For instance, this Court held that Microsoft violated Section 2 when it imposed conditions on third parties' access to its operating system and software licenses that parallel the conditions Facebook placed on access to its platform. The Court so held because a monopolist's right to refuse use of its intellectual property does not include the right to condition use on the acceptance of anticompetitive terms, *see* 253 F.3d at 63, particularly as part of a larger scheme involving a "variety of exclusionary acts," *id.* at 58, to keep potential rivals "below the critical level necessary . . . to pose a real threat to [its] monopoly," *id.* at 71. So too here.

Likewise, in *Lorain Journal Co. v. United States*, the Supreme Court rejected a monopolist newspaper's argument that it has "a right as a private business concern" to "refuse to accept advertisement from whomever it pleases," when the newspaper implemented a policy to accept

60

advertisements only on condition that the advertiser not advertise with a competing radio station. *See* 342 U.S. 143, 149, 155 (1951). Facebook's similar conditioning of third parties also states a claim of illegality. *See, e.g.*, *FTC v. Actavis, Inc.*, 570 U.S. 136, 157-58 (2013) (agreements with potential rivals to "prevent the risk of competition" may violate antitrust laws); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("agreements not to compete, with the aim of preserving or extending a monopoly" violate Section 2).

By contrast, in the cases cited by the district court that found no liability for a monopolist's mere unilateral refusal to deal, the defendant monopolist did not impose conditions that sought to restrain the conduct of third parties in the relevant market. For instance, in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, the plaintiff alleged only that the defendant unilaterally chose not to "share its network with competitors." 540 U.S. 398, 401 (2004). Similarly, in *Novell, Inc. v. Microsoft Corp.*, the plaintiff's claim rested only on the defendant's unilateral refusal to share its own intellectual property; anticompetitive conditioning imposed on a third party, or, indeed, "predatory" conduct of

61

any kind by the defendant "appear[ed] nowhere in the case." *See* 731 F.3d 1064, 1074 (10th Cir. 2013).

The district court erred in assuming (*see* JA 252-253) that the *only* time a monopolist's conditions on third parties can violate Section 2 is when those conditions interfere with the third parties' relationships with a competitor. Even if this characterization were accurate, the States' complaint *does* allege that Facebook imposed conditions on third-party apps' relationships with competing platforms, in addition to imposing conditions on the apps themselves. (*See* JA 93 (¶ 199).) More fundamentally, *Lorain Journal* recognizes Section 2 liability when a monopolist exercises its monopoly power through conditions on third parties intended "to destroy threatened competition." *See* 342 U.S. at 154. The method deployed by the monopolist to destroy competition in *Lorain Journal*, which happened to involve a condition on third parties' relationships with a competitor, satisfied this general test. But nothing in the Court's opinion suggests that this was *the* exclusive form of anticompetitive conditional dealing that might violate Section 2.

*Second*, the States have stated a claim that Facebook's platform-access policies violate Section 2 even if they are construed as a unilateral

refusal to deal. To be sure, the Supreme Court has recognized that a monopolist's refusal to deal with third parties, *standing alone*, generally does not give rise to liability under Section 2. *See Trinko*, 540 U.S. at 407-08. But "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id.* at 408.

Although the district court acknowledged these principles, it erred in finding that the only circumstances that would support Section 2 liability for a refusal to deal were those relied on by the Supreme Court in *Aspen Skiing*. (JA 243-244.) *Aspen Skiing* did not purport to identify a rigid test for determining when a monopolist's treatment of a third party could give rise to Section 2 liability. *See* 472 U.S. 585. To the contrary, the Supreme Court has eschewed overly "formalistic" antitrust rules, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992), and emphasized that courts' "analysis must always be attuned to the particular structure and circumstances of the industry at issue," *Trinko*, 540 U.S. at 411. This Court too has adopted a flexible standard for assessing Section 2 claims to reflect the fact that "the means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58. Likewise, other courts have recognized that the

63

"*Aspen Skiing* factors" are not independent requirements, but rather "help case-by-case assessments of whether a challenged refusal to deal is indeed anticompetitive." *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 457 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2877 (2021).

Applying the proper standard, the States' complaint alleges several factors that demonstrate the unlawfulness of Facebook's platform-access policies. For one thing, Facebook's policies had both an anticompetitive purpose and effect. Although a monopolist is not categorically required to share its resources with others, refusing to deal "as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Aspen Skiing*, 472 U.S. at 601-02 (quotation marks omitted). Here, the States have extensively alleged that Facebook's policies "were prompted not by competitive zeal but by anticompetitive malice," *Trinko*, 540 U.S. at 409. Facebook purposefully shut down a mutually beneficial practice of offering open API access, and began selectively identifying and excluding third-party apps, in order to squash potential competitors and maintain its monopoly, even at the expense of its own short-term profits (see *supra* at 6-7, 11-13). The Supreme Court has previously found such selective cutting off of access for certain third parties in order to "foreclose

competition . . . or to destroy a competitor" to be an antitrust violation, particularly when, as here, the monopolist sacrifices short-term benefits to achieve these long-term anticompetitive gains. *Otter Tail*, 410 U.S. at 377.

Facebook's purposeful scheme also had its intended effect, making clear to potential competitors and investors "that valuable access to Facebook's APIs was conditioned on their staying away from Facebook's turf in personal social networking services, thus chilling, deterring, and suppressing competition," and harming consumers. (JA 48 (¶ 15); *see also* JA 106-109 (¶¶ 245-255).) Indeed, the district court itself recognized that Facebook's platform conduct had "continuing, present adverse effects." (JA 249.)

Facebook's platform policies are especially suspect because Facebook targeted nascent competitors, whom Facebook identified early and then sought to starve out of existence by excluding them from APIs that were available to others. In *Microsoft*, this Court expressed particular concern about the threat of exclusionary conduct directed against nascent competitors, explaining that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit

65

unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." 253 F.3d at 79. The same concern applies here, where Facebook both (a) excluded nascent competitors' access to APIs they needed to grow, and (b) cut off access to apps specifically to prevent them from supporting nascent competitors. (*See, e.g.*, JA 45-46, 69, 88-90, 93 (¶¶ 4-6, 104, 181-187, 199).) *See also* Hemphill & Wu, *supra* (explaining the need for special solicitude for nascent competitors).

Moreover, Facebook's policies to cut off API access to third parties that it deemed competitive threats constitute the type of cessation of a prior course of dealing that raises special concerns under Section 2. Contrary to the district court's reasoning (JA 243-246), *Aspen Skiing* and *Trinko* do not limit an unlawful refusal to deal to one where the monopolist had a prior course of dealing with a *particular* third party. Here, the States alleged that Facebook had a prior practice of making its APIs broadly available to third-party app developers—then reversed course to maintain its monopoly, both through its new policy conditioning API access, and through cutoffs of particular third parties. See *supra* at 11-13. The allegations about reversal of an industry-wide course of dealing

66

are consistent with *Aspen Skiing*'s concern with purposeful actions that sacrifice short-term benefits to solidify long-term monopoly power, *see* 472 U.S. at 608, 610-11, and thus support Section 2 liability, just as the district court correctly recognized the allegations regarding cutoffs of particular apps could (JA 238, 247-251).

### 3.   The district court improperly dismissed the States' claims without providing an opportunity for further factual development.

Finally, the district court erred in dismissing the Section 2 claim at this early stage, before the States had an opportunity to prove the unlawfulness of the distinctive course of conduct in the market at issue. The Supreme Court and this Court "ha[ve] preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts" and "actual market realities" "disclosed by the record," *Eastman Kodak*, 504 U.S. at 466-67 (quotation marks omitted), just as this Court did in *Microsoft*, *see* 253 F.3d at 47. The States are entitled to the same opportunity to develop a record. That opportunity is particularly important here because "applying old doctrines to new digital platforms is rarely straightforward." *Biden*, 141 S. Ct. at 1221 (Thomas, J., concurring).

Moreover, any defense that Facebook asserts as to its conduct—for example, that it engaged in a justifiable refusal to deal or that the misconduct was too long ago to justify relief now—"depends upon . . . question[s] of fact" (e.g., how and when Facebook implemented its platform policies), "and therefore is not cognizable in support of a motion to dismiss." *Covad*, 398 F.3d at 676. Because "balancing anticompetitive effects against hypothesized justifications depends on evidence," it "is not amenable to resolution on the pleadings," where, as here, "the plaintiff has alleged conduct similar to that in *Aspen Skiing*." *Viamedia*, 951 F.3d at 460.

The district court's reliance on out-of-circuit cases like *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), *Novell*, 731 F.3d 1064, and *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986), was misplaced (among other reasons) because those cases were decided after full trials—not on motions to dismiss. *See Qualcomm*, 969 F.3d at 986-87, 994-95 (finding of lawful refusal to deal based on specific evidence at trial); *Novell*, 731 F.3d at 1066, 1076-78 (similar); *Olympia*, 797 F.2d at 371, 374-80 (similar); *see also Viamedia*, 951 F.3d at 460 (distinguishing *Novell* and *Olympia* because they were decided after trial).

68

If Facebook can prove after trial that its course of conduct was not anticompetitive, it may prevail on the States' Section 2 claim. But, when Facebook has not shown as a matter of law that the complaint's allegations offer no "plausible scenario" supporting a claim, the "court may not dismiss." *Atherton v. District of Columbia Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quotation marks omitted).

## CONCLUSION

The Court should reverse the district court's order dismissing the States' case and remand for further proceedings.

Dated:    New York, New York
          January 14, 2022

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Plaintiffs-Appellants


                    By:    */s/ Philip J. Levitz*
                           PHILIP J. LEVITZ
                           Assistant Solicitor General

BARBARA D. UNDERWOOD            28 Liberty Street
  *Solicitor General*          New York, NY 10005
STEVEN C. WU                   (212) 416-6325
  *Deputy Solicitor General*
PHILIP J. LEVITZ
  *Assistant Solicitor General*
     *of Counsel*

*(Counsel listing continues on the following pages.)*

70

FOR THE DISTRICT OF
   COLUMBIA

KARL A. RACINE
  *Attorney General*
Loren L. AliKhan
Caroline S. Van Zile
Megan D. Browder
400 6th Street, NW
Washington, DC 20001
(202) 727-3400

FOR THE STATE OF
   CALIFORNIA

ROB BONTA
  *Attorney General*
Paula L. Blizzard
Mina Noroozkhani
455 Golden Gate Avenue, Suite
  11000
San Francisco, CA 94102-7004
(415) 510-3765

FOR THE STATE OF
   COLORADO

PHILIP J. WEISER
  *Attorney General*
Jeffrey H. Blattner
Diane R. Hazel
Carla J. Baumel
1300 Broadway
Denver, CO 80203
(720) 508-6000

FOR THE STATE OF
   FLORIDA

ASHLEY MOODY
  *Attorney General*
Nicholas D. Niemiec
The Capitol PL-01
Tallahassee, FL 32399-1050
(850) 414-3300

FOR THE STATE OF
   IOWA

THOMAS J. MILLER
  *Attorney General*
Max M. Miller
1305 East Walnut Street
Hoover Building, 2nd Floor
Des Moines, IA 50319-0001
(515) 281-5164

FOR THE STATE OF
   NEBRASKA

DOUGLAS J. PETERSON
  *Attorney General*
Douglas J. Peterson
Shereece Dendy-Sanders
Joseph M. Conrad
2115 State Capitol
Lincoln, NE 68508
(402) 471-3833

71

FOR THE STATE OF
  NORTH CAROLINA

JOSHUA H. STEIN
  *Attorney General*
Sarah G. Boyce
PO Box 629
Raleigh, NC 27690
(919) 716-6400

FOR THE STATE OF
  OHIO

DAVE YOST
  *Attorney General*
Jennifer L. Pratt
Beth A. Finnerty
James C. Roberts
30 East Broad Street, 26th Floor
Columbus, OH 43215
(614) 466-4328

FOR THE STATE OF
  TENNESSEE

HERBERT H. SLATERY III
  *Attorney General & Reporter*
J. David McDowell
PO Box 20207
Nashville, TN 37202
(615) 741-7663

FOR THE STATE OF
  ALASKA

TREG R. TAYLOR
  *Attorney General*
Mary Hunter Gramling
PO Box 110300
Juneau, AK 99811-0300
(907) 465-2133

FOR THE STATE OF
  ARIZONA

MARK BRNOVICH
  *Attorney General*
Drew Ensign
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-5252

FOR THE STATE OF
  ARKANSAS

LESLIE RUTLEDGE
  *Attorney General*
Johnathan R. Carter
323 Center Street, Suite 200
Little Rock, AR 72201

72

FOR THE STATE OF
   CONNECTICUT

WILLIAM TONG
   *Attorney General*
Clare E. Kindall
165 Capitol Avenue
Hartford, CT 06106


FOR THE STATE OF
   DELAWARE

KATHLEEN JENNINGS
   *Attorney General*
Michael A. Undorf
820 North French Street, 5th
   Floor
Wilmington, DE 19801
(302) 577-8600


FOR THE TERRITORY OF
   GUAM*

LEEVIN TAITANO CAMACHO
   *Attorney General*
590 South Marine Corps Drive,
   Suite 901
Tamuning, GU 96913


FOR THE STATE OF
   HAWAII

HOLLY T. SHIKADA
   *Attorney General*
Rodney I. Kimura
425 Queen Street
Honolulu, HI 96813
(808) 586-1180


FOR THE STATE OF
   IDAHO

LAWRENCE G. WASDEN
   *Attorney General*
David B. Young
954 West Jefferson Street, 2nd
   Floor
PO Box 83720
Boise, ID 83720
(208) 334-2424


FOR THE STATE OF
   ILLINOIS

KWAME RAOUL
   *Attorney General*
Alex Hemmer
100 West Randolph Street, 12th
   Floor
Chicago, IL 60601
(312) 814-3000

FOR THE STATE OF
  INDIANA

TODD ROKITA
  *Attorney General*
Matthew Michaloski
Scott Barnhart
302 West Washington Street
Indiana Government Center
  South, 5th Floor
Indianapolis, IN 46204
(317) 234-1479

FOR THE STATE OF
  KANSAS

DEREK SCHMIDT
  *Attorney General*
Jeffrey A. Chanay
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612
(785) 296-2215

FOR THE COMMONWEALTH
  OF KENTUCKY

DANIEL CAMERON
  *Attorney General*
Jonathan Farmer
1024 Capital Center Drive,
  Suite 200
Frankfort, KY 40601
(502) 696-5300

FOR THE STATE OF
  LOUISIANA*

JEFF LANDRY
  *Attorney General*
1885 North Third Street, 4th
  Floor
Baton Rouge, LA 70802

FOR THE STATE OF
  MAINE

AARON M. FREY
  *Attorney General*
Christina M. Moylan
Elizabeth Reardon
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

FOR THE STATE OF
  MARYLAND

BRIAN E. FROSH
  *Attorney General*
Adam D. Snyder
Schonette Jones Walker
Gary Honick
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-3000

74

FOR THE COMMONWEALTH
   OF MASSACHUSETTS

MAURA HEALEY
   *Attorney General*
Michael B. MacKenzie
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200


FOR THE PEOPLE OF THE
   STATE OF MICHIGAN

DANA NESSEL
   *Attorney General*
Scott A. Mertens
PO Box 30736
Lansing, MI 48933
(517) 335-0746


FOR THE STATE OF
   MINNESOTA*

KEITH ELLISON
   *Attorney General*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101


FOR THE STATE OF
   MISSISSIPPI

LYNN FITCH
   *Attorney General*
Elisabeth Hart Pepper Martin
PO Box 220
Jackson, MS 39205


FOR THE STATE OF
   MISSOURI

ERIC SCHMITT
   *Attorney General*
Stephen M. Hoeplinger
815 Olive St., Suite 200
St. Louis, MO 63101
(314) 340-7849


FOR THE STATE OF
   MONTANA

AUSTIN KNUDSEN
   *Attorney General*
Mark W. Mattioli
PO Box 200151
Helena, MT 59620-0151
(406) 444-4500

75

FOR THE STATE OF
   NEVADA

AARON D. FORD
   *Attorney General*
Marie W.L. Martin
100 North Carson Street
Carson City, NV 89701-4717
(775) 684-1100

FOR THE STATE OF
   NEW MEXICO

HECTOR H. BALDERAS
   *Attorney General*
Brian E. McMath
408 Galisteo Street
Villagra Building
Santa Fe, NM 87504
(505) 490-4060

FOR THE STATE OF
   NEW HAMPSHIRE*

JOHN M. FORMELLA
   *Attorney General*
33 Capitol Street
Concord, NH 03301-6397
(603) 271-3658

FOR THE STATE OF NORTH
   DAKOTA

WAYNE STENEHJEM
   *Attorney General*
Parrell D. Grossman
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
(701) 328-5570

FOR THE STATE OF
   NEW JERSEY

ANDREW BRUCK
   *Acting Attorney General*
Isabella R. Pitt
PO Box 45029
124 Halsey Street, 5th Floor
Newark, NJ 07102
(973) 648-7819

FOR THE STATE OF
   OKLAHOMA

JOHN O'CONNOR
   *Attorney General*
Caleb J. Smith
313 NE 21st Street
Oklahoma City, OK 73105

76

FOR THE STATE OF
   OREGON

ELLEN F. ROSENBLUM
  *Attorney General*
Cheryl F. Hiemstra
1162 Court Street NE
Salem, OR 97301
(503) 934-4400

FOR THE STATE OF
   TEXAS

KEN PAXTON
  *Attorney General*
William J. Shieber
300 West 15th Street
Austin, TX 78701
(512) 463-4012

FOR THE COMMONWEALTH
   OF PENNSYLVANIA

JOSH SHAPIRO
  *Attorney General*
Abigail U. Wood
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(717) 433-1755

FOR THE STATE OF
   UTAH

SEAN D. REYES
  *Attorney General*
Melissa A. Holyoak
PO Box 140873
160 East 300 South, 5th Floor
Salt Lake City, UT 84114-0873
(801) 366-0113

FOR THE STATE OF
   RHODE ISLAND

PETER F. NERONHA
  *Attorney General*
Michael W. Field
150 South Main Street
Providence, RI 02903
(401) 274-4400

FOR THE STATE OF
   VERMONT

THOMAS J. DONOVAN JR.
  *Attorney General*
Benjamin D. Battles
109 State Street
Montpelier, VT 05609-1001
(802) 828-3171

77

FOR THE COMMONWEALTH
  OF VIRGINIA

MARK R. HERRING
  *Attorney General*
Sarah Oxenham Allen
Tyler T. Henry
202 North 9th Street
Richmond, VA 23219
(804) 692-0485

FOR THE STATE OF
  WASHINGTON

ROBERT W. FERGUSON
  *Attorney General*
Amy N.L. Hanson
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-5419

FOR THE STATE OF WEST
  VIRGINIA

PATRICK MORRISEY
  *Attorney General*
Tanya L. Godfrey
PO Box 1789
Charleston, WV 26326
(304) 558-8986

FOR THE STATE OF
  WISCONSIN

JOSHUA L. KAUL
  *Attorney General*
Gwendolyn J. Cooley
PO Box 7857
17 West Main Street
Madison, WI 53707-7857

FOR THE STATE OF
  WYOMING

BRIDGET HILL
  *Attorney General*
Amy A. Pauli
109 State Capitol
200 West 24th Street
Cheyenne, WY 82002
(307) 777-7841

\*    Appellants identified with an asterisk have authorized the above-
     listed admitted counsel for the State of New York to represent them
     in this appeal.

78

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e) because it contains 12,992 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated:  New York, NY
        January 14, 2022

                                            */s/ Philip J. Levitz*

# Addendum

# TABLE OF CONTENTS

**Page**

Sherman Act § 2, 15 U.S.C. § 2 ..........................................................ADD1

Clayton Act § 7, 15 U.S.C. § 18 .........................................................ADD1

Clayton Act § 16, 15 U.S.C. § 26 .......................................................ADD2

**Sherman Act § 2, 15 U.S.C. § 2**

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**Clayton Act § 7, 15 U.S.C. § 18**

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

**ADD1**

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

. . .

**Clayton Act § 16, 15 U.S.C. § 26**

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such

proceedings . . . .  In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

**ADD3**

## CERTIFICATE OF SERVICE

In compliance with Circuit Rule 47.1(d)(2), I(2), on January 14, 2022,

I served public and sealed copies of the brief and a public appendix and

sealed supplement by electronic mail on consent to:

Aaron M. Panner
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
apanner@kellogghansen.com


Dated:  New York, NY
        January 14, 2022

*/s/ Philip J. Levitz*