**ORAL ARGUMENT NOT SCHEDULED**

No. 21-7078

# United States Court of Appeals
# for the District of Columbia Circuit

STATE OF NEW YORK, *et al.*,
*Plaintiffs-Appellants,*

v.

FACEBOOK, INC.,
*Defendant-Appellee,*

On Appeal from the United States District Court
for the District of Columbia, No. 1:20-cv-03589
The Honorable James E. Boasberg

## BRIEF OF THE UNITED STATES AS AMICUS CURIAE SUPPORTING PLAINTIFFS-APPELLANTS

Jonathan S. Kanter
*Assistant Attorney General*
Doha G. Mekki
*Principal Deputy Assistant Attorney General*
David B. Lawrence
*Policy Director*
Daniel E. Haar
Nickolai G. Levin
Adam D. Chandler
Cecilia Y. Cheng
*Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW #3320
Washington, DC 20530
202-514-2886
Nickolai.Levin@usdoj.gov

January 28, 2022    *Counsel for United States of America*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The plaintiffs-appellants are the State of New York, District of Columbia, State of California, State of Colorado, State of Florida, State of Iowa, State of Nebraska, State of North Carolina, State of Ohio, State of Tennessee, State of Alaska, State of Arizona, State of Arkansas, State of Connecticut, State of Delaware, Territory of Guam, State of Hawaii, State of Idaho, State of Illinois, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State of North Dakota, State of Oklahoma, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Texas, State of Utah, State of Vermont, Commonwealth of Virginia, State of Washington, State of West Virginia, State of Wisconsin, and State of Wyoming.

The defendant-appellee is Facebook, Inc.  In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc.; however, the caption in this case has not been changed.

The parties and caption in this Court are the same as in the district court.

In this Court, the United States appears as amicus curiae supporting plaintiffs-appellants. The Committee to Support the Antitrust Laws, Economists (Daron Acemoglu, Cristina Caffarra, Gregory S. Crawford, Tomaso Duso, Florian Ederer, Massimo Motta, Martin Peitz, Thomas Philippon, Nancy L. Rose, Robert Seamans, Hal Singer, Marshall Steinbaum, Joseph E. Stiglitz, Ted Tatos, Tommaso Valletti, Luigi Zinga), and Former State Antitrust Enforcement Officials and Antitrust Law Professors (Lloyd Constantine, Harry First, Aaron Edlin, Andrew Chin, Andrew I. Gavil, Andrew Rossner, Anne Schneider, Barak Richman, Barak Y. Orbach, Charles G. Brown, Christopher L. Sagers, Dan Drachler, Darren Bush, Don Allen Resnikoff, Edward Cavanagh, Eleanor Fox, Ellen Cooper, George Sampson, James Tierney, Jeffrey L Harrison, John B. Kirkwood, Joshua P. Davis, Kevin J. O'Connor, Marina Lao, Maurice Eitel Stucke, Norman W. Hawker, Pamela Jones Harbour, Paul F. Novak, Peter Carstensen, Rebecca Haw Allensworth, Robert Abrams, Robert H. Lande, Samuel N. Weinstein, Steven M. Rutstein, Susan Beth Farmer, Tam Ormiston, Thomas Greaney, Thomas J. Horton, and Warren Grimes) all appear as amicus curiae, also supporting plaintiffs-appellants.

**B. Rulings Under Review**

References to the rulings at issue appear in the Brief for Plaintiffs-

Appellants.

**C. Related Cases**

A list of related cases appears in the Brief for Plaintiffs-Appellants.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES ............................................................................................. i

TABLE OF CONTENTS ............................................................... iv

TABLE OF AUTHORITIES ......................................................... vi

GLOSSARY OF ABBREVIATIONS ............................................ ix

INTEREST OF THE UNITED STATES ........................................ 1

STATUTORY PROVISIONS ......................................................... 1

ISSUES PRESENTED ................................................................... 2

STATEMENT ................................................................................ 2

ARGUMENT ................................................................................. 4

I.    THE DISTRICT COURT MISAPPLIED SECTION 2 OF THE
      SHERMAN ACT ................................................................... 6

      A.    The District Court Erred By Disaggregating Plaintiffs'
            Monopolization Claim. ................................................ 8

      B.    The District Court Did Not Properly Analyze Plaintiffs'
            Platform Allegations ................................................ 13

            1.    Many Platform Allegations Do Not Challenge
                  Unilateral Refusals To Deal. ......................... 14
            2.    No Universal Checklist Governs All Unilateral Refusal-
                  To-Deal Claims. .......................................... 19
            3.    This Case Presents Materially Different Market
                  Realities From *Trinko*. ................................ 24

II.   THE DISTRICT COURT ERRONEOUSLY RULED OUT THE
      POSSIBILITY OF INJUNCTIVE RELIEF .......................... 27

CONCLUSION ........................................................................... 31

CERTIFICATE OF COMPLIANCE .......................................... 33

CERTIFICATE OF SERVICE ...................................................................34

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)............................................................ 14, 19, 22, 23

*Biden v. Knight First Amendment Institution At Columbia University*,
  141 S. Ct. 1220 (2021) ...........................................................23

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
  386 U.S. 129 (1967) ...............................................................30

*City of Anaheim v. Southern California Edison Co.,*
  955 F.2d 1373 (9th Cir. 1992) ............................................11

*Comcast Corp. v. Viamedia, Inc.,* 141 S. Ct. 2877 (2021) ......................................20

**Covad Communications v. Bell Atlantic Corp.*,
  398 F.3d 666 (D.C. Cir. 2005) ........................................ 19, 20, 21, 23

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) .........8

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972).........................................27

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ...........................................23

*FTC v. Vyera Pharmaceuticals, LLC,*
  479 F. Supp. 3d 41 (S.D.N.Y. 2020)...................................21

*Klein v. Facebook, Inc.*,
  No. 20-08570, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022)..................9

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ..................................................10

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) .............................. 15, 27

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004).......................29

*Mercoid Corp. v. Mid-Continent Inv. Co*., 320 U.S. 661 (1944)............................18

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978) ................................................................................28

*NCAA v. Alston*, 141 S. Ct. 2141 (2021) ........................................... 24, 25

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986) .......................21

*Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958) .........................7

*Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ..................... 16, 21

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) .......................... 21, 26

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
   555 U.S. 438 (2009) ................................................................................14

*Schine Chain Theatres v. United States*, 334 U.S. 110 (1948)................................30

*Standard Oil Co. v. FTC*, 340 U.S. 231 (1951) ..........................................6

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911)............................................10

*United States v. American Tobacco Co.*, 221 U.S. 106 (1911) ........................ 10, 12

*United States v. Bazaarvoice, Inc.*,
   No. 13-00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)................................12

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)...................6

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957)................12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).........................................7, 10

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975).......................12

*United States v. Paramount Pictures*, 334 U.S. 131 (1948)...................................10

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) .................................6

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968)...................28

*United States v Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................ 7, 8, 9, 10, 11, 15, 16, 18, 27, 30, 31

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,
LLP*, 540 U.S. 398 (2004).......................................... 7, 14, 19, 21, 22, 24, 25, 26

* *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)....... 20, 21, 22, 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ...................28

## STATUTES

15 U.S.C. § 2 ...........................................................................................................1

15 U.S.C. § 26 .........................................................................................................1

## RULES

Fed. R. App. P. 29 ...................................................................................................1

## OTHER AUTHORITIES

Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions*,
129 J. Pol. Econ. 649 (2021)...............................................................................12

DOJ-FTC Antitrust Guidelines for Licensing Intellectual Property (2027)............18

Robin C. Feldman & Mark A. Lemley, *Atomistic Antitrust* (Feb. 26, 2021)..........13

Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683 (2020).....17

## GLOSSARY OF ABBREVIATIONS

The following abbreviations and acronyms are used in this brief:

| | |
|---|---|
| App | Application |
| API | Application Programming Interface |
| DOJ | Department of Justice |
| FTC | Federal Trade Commission |
| NCAA | National Collegiate Athletic Association |

## INTEREST OF THE UNITED STATES

The United States enforces the federal antitrust laws and has a strong interest in the correct application of Section 2 of the Sherman Act, 15 U.S.C. § 2. It frequently brings antitrust enforcement actions along with State co-plaintiffs acting in their *parens patriae* capacity, and thus has a strong interest in protecting States' enforcement authority under Section 16 of the Clayton Act, 15 U.S.C. § 26, including their ability to seek effective antitrust relief to restore lost competition. The federal government also has an antitrust case against Facebook. *FTC v. Facebook*, No. 1:20-cv-03590-JEB (D.D.C.). We file this brief under Federal Rule of Appellate Procedure 29(a).

## STATUTORY PROVISIONS

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

Section 16 of the Clayton Act, 15 U.S.C. § 26, provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws,

including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity."

## ISSUES PRESENTED

The United States will address the following issues:

1.   Whether the district court misapplied Section 2 of the Sherman Act by: (a) failing to analyze plaintiffs' monopolization claim alleging an anticompetitive course of conduct as a whole; (b) mischaracterizing plaintiffs' challenge to anticompetitive conditions in Facebook's then-existing deals as unilateral refusals to deal; and (c) creating a rigid "three-part test" for liability for unilateral refusals to deal?

2.   Whether the district court erroneously ruled out the possibility of injunctive relief without any factual development on the conduct's likelihood of recurrence or its ongoing effects on the marketplace?

## STATEMENT

Forty-six States, the District of Columbia, and Guam (collectively, "States") brought suit to end Facebook's monopolization of the personal social-networking services market.  Plaintiffs have alleged that Facebook engaged in a broad anticompetitive "course of conduct" to "buy or bury" emerging competitive threats and build a "moat" protecting its platform

monopoly.  A45-A46 (¶¶ 4, 5), A69 (¶ 104).  Among other alleged anticompetitive conduct, Facebook acquired Instagram and WhatsApp to neutralize them as potential rivals and to prevent competitors from owning their technology and gaining their large user networks, A47 (¶ 12), A68-A71 (¶¶ 102-104, 111), A80-A81 (¶¶ 149-50), A89 (¶ 185), and Facebook leveraged its application programming interfaces (APIs) to induce app developers not to take actions potentially posing a competitive threat, A93-A94 (¶¶ 199-202), A102 (¶ 231).  For instance, Facebook allegedly amended its policies to prevent third-party apps from integrating with and supporting competing platforms, and forbade them from "replicating core [Facebook] functionality" in apps operating on its platform, A93 (¶ 201), and these conditions potentially applied even as Facebook "expanded its functionality" to "new area[s]," *id.*  These restrictive conditions allegedly dissuaded developers from creating innovative features or offering competing services, A48 (¶ 15), A90 (¶ 187), A93-A94 (¶ 202), A102 (¶ 231), and from developing apps that might have increased consumers' ability to switch between Facebook and other platforms, A93 (¶ 199).

The district court dismissed the complaint.  Separating Facebook's alleged course of anticompetitive conduct into two parts—platform conduct and acquisitions—the court held that the platform allegations either failed to

3

satisfy its "three-part test" for liability for unlawful refusals to deal, A237-A246, or were irremediable, A247-A251.  It then dismissed the acquisitions claims for laches.  A256-A282.[1]

## ARGUMENT

The antitrust laws have endured through time because of their flexibility in addressing new technologies and changing market realities. Section 2 is able to prevent monopolization across these changes because precedent requires flexible, fact-specific analysis that accounts for the market realities relevant to particular controversies.

Recent years have seen a sea change in the economy.  The online digital economy has revolutionized the way people interact, how businesses engage and compete with one another, and what drives economic value. Digital platforms like Facebook can have hundreds of millions of users and massive amounts of app developers contributing to building networks that invite, and thrive on, user and third-party engagement.

The complaint details how Facebook allegedly monopolized the personal social-networking services market, as that market evolved and grew, through a broad course of anticompetitive conduct that eliminated businesses'

---

[1] The court also divided the FTC's complaint into "acquisitions" and "platform" claims and held that it could pursue the acquisitions claims but not the platform claims.  Doc. 90, at 39-40 (Case 1:20-cv-03590-JEB).

incentive and ability to challenge that monopoly.  Among other alleged anticompetitive conduct, Facebook welcomed app developers onto its platform to build social-networking functionality but later reversed course and conditioned such access on app developers limiting the ways in which they competed with Facebook; hobbled the success of existing competitors; and acquired emerging rivals such as Instagram and WhatsApp to extinguish nascent competitive threats.  Discovery and deliberation are necessary to understand these allegations and how they intersect with the competitive dynamics of the market.

In dismissing the complaint, the district court made several errors. Most significantly, the court fundamentally misapplied Section 2.  Whereas the law calls for evaluating the course of conduct alleged in the monopolization claim as a whole, the court disaggregated the claim into parts that it never reassembled.  Meanwhile, the court erroneously treated Facebook's alleged use of anticompetitive conditions in deals with app developers as unconditional, unilateral refusals to deal.   The court then compounded these errors by applying a rigid checklist for unilateral refusal-to-deal liability that departs from established precedent and takes no account of the market realities of Facebook's platform, which generates value by encouraging participation from developers and users.  Finally, the court had

5

an unduly narrow understanding of both the potential injunctive relief sought here and the scope of permissible antitrust remedies.

These errors applying the Sherman Act's anti-monopoly protections are highly consequential.  States are key partners to the federal government in investigating antitrust cases and bringing suit, with States playing important roles in many matters of regional and national concern.  Over the last ten years, States have been co-plaintiffs with either DOJ or the FTC in over thirty antitrust enforcement actions.  Here, the FTC and plaintiffs brought separate lawsuits against Facebook but jointly cooperated in their investigations and litigation in pursuit of a shared mission to protect the public from unlawful monopolization.  Such federal-state partnerships are essential to vigorous and effective antitrust enforcement.   Yet through misapplication of federal antitrust law, the decision below improperly ended the States' participation in this important antitrust case short of discovery.

## I.    THE DISTRICT COURT MISAPPLIED SECTION 2 OF THE SHERMAN ACT

The "heart of our national economic policy long has been faith in the value of competition."  *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951).  The Sherman Act is the "Magna Carta of free enterprise," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)—"a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the

rule of trade," *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). Section 2 of the Sherman Act effectuates that goal by "achiev[ing] for the Nation the freedom of enterprise from monopoly." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 385-86 (1956).

The offense of monopolization requires "monopoly power" and "the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The latter requires proof of exclusionary or "anticompetitive" conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Because "the means of illicit exclusion, like the means of legitimate competition, are myriad," this Court has adopted a flexible, fact-specific burden-shifting approach for finding anticompetitive conduct. *United States v Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc). First, the plaintiff must show that the challenged conduct has an "anticompetitive effect"—that it "harm[s] the competitive *process* and thereby harm[s] consumers." *Id*. If the plaintiff does so, the burden shifts to the monopolist to show a sufficient "procompetitive justification" for its conduct. *Id.* at 59. If that is established, the plaintiff has the burden "to rebut that claim" or "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.*

The district court, however, did not apply this flexible, fact-specific approach. Instead, the court split plaintiffs' monopolization claim into two pieces, and subjected the platform allegations to a conduct-specific test for unilateral refusals to deal, A239-A240, while never analyzing the contributory anticompetitive effect of the acquisitions (to which it held laches applied). The court legally erred both in disaggregating plaintiffs' monopolization claim and in its analysis of the platform allegations.

### A.     The District Court Erred By Disaggregating Plaintiffs' Monopolization Claim.

The Supreme Court has emphasized the importance of resolving Section 2 claims on a "case-by-case basis," focusing on "actual market realities" and the "particular facts disclosed by the record." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992). Disaggregating plaintiffs' monopolization claim fundamentally impeded the court's ability to assess the market realities presented by this case.

An important market reality here is that Facebook's platform has "strong network effects." A72 (¶ 116); *see* A54 (¶¶ 41-42), A92 (¶ 195), A93-A94 (¶ 202). Network effects mean that "the utility that a user derives from consumption of the good increases with the number of other agents consuming the good," *Microsoft*, 253 F.3d at 49, and accordingly the platform itself derives greater value the more participants it attracts. "In

markets characterized by network effects," once "a product or standard achieves wide acceptance, it becomes more or less entrenched." *Id.*; *see id.* at 83 (network effects can act as barriers to entry); *Klein v. Facebook, Inc.*, No. 20-08570, 2022 WL 141561, at *19 (N.D. Cal. Jan. 14, 2022) ("network effects create high barriers to entry in the Social Network and Social Media Markets because, even if a new service offers higher quality features than incumbent services, the new service is inherently less valuable because it has a smaller user base than incumbent services").

Because of network effects on Facebook's platform, multiple anticompetitive acts can exponentially reinforce the exclusionary impact. For example, multiple anticompetitive acts can work synergistically to exacerbate network effects and further entrench the dominant player by depriving rivals of the scale necessary to compete effectively.[2] *See* A57 (¶ 51), A71-A72 (¶¶ 114-115); *Microsoft*, 253 F.3d at 60, 71 (conduct preserved Microsoft's monopoly by keeping usage of Navigator "below the critical level necessary" to "pose a real threat to Microsoft's monopoly"). Because "[c]ompetition" is often "'for the field' rather than 'within the field'" in network industries, *id.* at 49, anticompetitive conduct can prevent the emergence of better products

---

[2] Multiple anticompetitive acts also can have synergistic effects in non-network industries through means other than network effects.

that could replace it for some or all users. *Id.* at 79 (the Sherman Act does not "allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts").

Plaintiffs' legal theory reflects these distinctive market realities, alleging that Facebook took advantage of the strong network effects on its platform and scale advantages over potential rivals, and used both acquisitions and other anticompetitive conduct to build a "moat" protecting its platform monopoly. *See* pp. 2-3, *supra*. The validity of such monopolization claims challenging the combined effect of acquisitions and other anticompetitive conduct is well-established. *See Grinnell*, 384 U.S. at 576; *United States v. Paramount Pictures*, 334 U.S. 131 (1948); *United States v. Am. Tobacco Co.*, 221 U.S. 106, 181-83 (1911); *Standard Oil Co. v. United States*, 221 U.S. 1, 71-77 (1911). In these cases, the Supreme Court focused on whether the evidence as a whole established the proscribed result, not whether particular acts did so in isolation. *See Am. Tobacco*, 221 U.S. at 182-83 (emphasizing that it was "not considering" the legality of certain conduct "isolatedly viewed"); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("The relevant inquiry is the anticompetitive effect of [the defendant]'s exclusionary practices considered together," i.e., "taken as a

10

whole rather than considering each aspect in isolation."); *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

Citing *Microsoft*, the district court acknowledged that a "'course of conduct' could amount to a separate and independent violation," but held that such a theory was not viable because the platform allegations challenged unilateral refusals to deal, and subjecting them to liability risked the policy consequences discussed in *Trinko*.  A245, A278-A280.[3]  But these are not valid reasons for forgoing cumulative consideration of plaintiffs' monopolization claim:  Many of the platform allegations do not challenge unilateral refusals to deal, *see infra* Section I.B.1, and the policy consequences for allowing enforcement in this area are significantly different than in *Trinko* due to the distinct market realities in both cases, *see infra* Section I.B.3.  Because synergistic anticompetitive effects could be especially pronounced for digital platforms that exhibit powerful network effects and

---

[3] In *Microsoft*, this Court declined to "pass upon plaintiffs' [course-of-conduct] argument" because the district court failed to explain the specific acts composing it—not because of concerns regarding the validity of the underlying theory of harm.  253 F.3d at 78.  In any event, *Microsoft* reached this conclusion based on a full trial record.

have scale advantages over potential rivals, the costs to competition of misclassifying challenged conduct as lawful refusals to deal—and thus missing its role in an overall anticompetitive scheme—are particularly significant in this context.

Moreover, by separating the acquisitions from the rest of the monopolization claim, the district court may have overlooked the full potential for anticompetitive effects. It sometimes takes many years for an acquisition "to ripen into a prohibited effect," *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957), because an acquisition can facilitate or give rise to anticompetitive conduct later through the "use" of the purchased assets, *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 241-42 (1975); *see Am. Tobacco*, 221 U.S. at 183. And in the platform context, acquisitions of smaller or nascent competitors can take on even greater significance because they eliminate rivals that could have competed within— or, even more likely, *for*—the field. *See United States v. Bazaarvoice, Inc.*, No. 13-00133, 2014 WL 203966, at *50 (N.D. Cal. Jan. 8, 2014) (Bazaarvoice's acquisition of PowerReviews "would definitely tip the scales in [Bazaarvoice's] permanent favor on the network front."); Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649, 655 (2021) ("Incumbents in already-concentrated markets further

reduce competition by acquiring *future* product market competitors."); Robin C. Feldman & Mark A. Lemley, *Atomistic Antitrust* at 5 (Feb. 26, 2021) ("an atomistic focus [in antitrust cases] misses important modern harms to competition including those related to large tech companies buying startups"), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3793809.

### B.    The District Court Did Not Properly Analyze Plaintiffs' Platform Allegations.

The district court erred in classifying all of the platform conduct as unilateral refusals to deal.  A251.  While some allegations may fit that characterization, many do not.  Specifically, Facebook allegedly conditioned API access in ways that prevent certain forms of rivalry and protect its dominance.  A93-A94 (¶¶ 199-202).  When a monopolist imposes conditions that restrict rivals' incentive and ability to compete, the restrictions are just that: conditions.  Instead, the court erroneously treated these anticompetitive conditions in Facebook's deals as unconditional refusals to deal.

The district court compounded that error by creating a rigid checklist for unilateral refusal-to-deal liability that departs from established precedent. The court's test also fails to account for important market realities, including the participatory nature of Facebook's platform.

1. **Many Platform Allegations Do Not Challenge Unilateral Refusals To Deal.**

The district court erred by analyzing all of plaintiffs' platform allegations as challenging unilateral refusals to deal with rivals. Many allegations involved a fundamentally different type of anticompetitive conduct—anticompetitive conditions in Facebook's deals. Since these allegations target Facebook's use of anticompetitive conditions, not its refusals to deal, they should have been subject to a flexible, fact-based analysis under *Microsoft*.

The Supreme Court has recognized two narrow, related situations that are properly analyzed as unilateral refusals to deal with rivals: (i) where the defendant outright refused to provide a rival a requested product or service, *see Trinko*, 540 U.S. at 407-09 (Verizon refused to provide competitors with access to certain telephone-network elements); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-11 (1985) (Ski Co. refused to sell joint lift tickets); and (ii) where a rival challenged an ongoing deal with commercially disadvantageous terms, which the Court viewed as challenging the defendant's refusal to offer more favorable terms, *see Pacific Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 442, 451 (2009) (firm complained that high wholesale prices created insufficient profit margins).

14

These categories do not cover the full range of plaintiffs' platform allegations.  For example, Facebook allegedly conditioned API access on apps not linking to or integrating with competing social networks, or incorporating "core" social-networking features themselves.  A93-A94 (¶¶ 199-202).  These allegations are fundamentally different from challenges to unilateral refusals to deal.  Rather, Facebook's use of restrictive conditions in deals with app developers are akin to the type of anticompetitive conduct condemned in *Lorain Journal Co. v. United States*, 342 U.S. 143, 148 (1951) (monopolist newspaper sold advertising only if customers did not place ads with rival radio station), and in *Microsoft*, 253 F.3d at 75 (Microsoft induced independent software vendors "to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users [Java Virtual Machines] that complied with [rival's] standards.").

Unlike unilateral refusals to deal, which can harm competition by withholding valuable access from rivals (leaving them weakened and less competitive), plaintiffs allege conditions that harm competition by inducing app developers to change their behavior by limiting or discouraging them from dealing with Facebook's rivals or by deterring them from becoming rivals to Facebook themselves.  By altering app developers' incentives and conduct, the restrictive conditions represent an anticompetitive "assay by the

monopolist into the marketplace." *Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).

The court stated that it would have recognized a "conditional dealing" claim under *Lorain Journal* if plaintiffs alleged "that Facebook conditioned access to its Platform APIs on app developers agreeing not to deal with other social-networking services." A253. But the court distinguished this case on the ground that the challenged conditions did not prevent app developers from dealing with rivals outside of Facebook's platform; rather, they simply regulated the "acceptable features" of apps used on Facebook itself. A255. That limitation, however, is nowhere to be found in *Lorain Journal*. Moreover, it is inconsistent with how this Court treated analogous conditions in *Microsoft*. There, certain restrictions on app developers applied only to applications running on Windows. 253 F.3d at 75. Yet this Court did not analyze those restrictions as refusals to deal; it subjected them to its flexible, fact-specific analysis and found them anticompetitive. *Id.*

Similarly, here, Facebook allegedly amended its conditions of dealing in 2011 to prevent "apps that linked or integrated with competing social platforms[] from accessing its APIs" as a deterrent for building cross-platform apps. A93 (¶ 199). That is, even if it did not violate the Policy for a developer to build an app on a competing platform, plaintiffs alleged that it

practically eliminated their incentive to do so.  Among other things, the

Policy disincentivized developers from dealing with rivals by "discourag[ing]

developers from creating apps that bridged the two networks, which would

have reduced switching costs for users."  *Id.*  By deterring cross-platform

apps, the restrictive conditions harmed the competitive process and protected

Facebook's monopoly.  *Cf. Microsoft*, 253 F.3d 74 ("Microsoft took [] steps

to exclude Java from developing as a viable cross-platform threat.").  And in

2013, Facebook allegedly introduced a condition prohibiting apps from

replicating Facebook's "core functionality," A94 (¶ 202), which

disincentivized apps from introducing new features that would have

benefitted users but also made them less reliant on Facebook.

   The district court stated that *Trinko* should apply because unilateral

refusals to deal with rivals "can always be reframed as offers to deal only on

the condition that the third party refrains from competing."  A251 (citing

Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683, 1697

(2020)).[4]  But the court's statement is wrong.  For example, a wholly

---

[4] The district court also reasoned that the conditions could not be condemned
because Facebook had no antitrust duty to deal with the developers.  A243-
A244.  But the court's conclusion does not follow from its premise.  Even
without a duty to deal, a company entering into a deal restricting competition
can face liability for the restriction.  For example, a patent holder has no
obligation to grant a license, but an anticompetitive condition in a patent

17

unconditional refusal to deal on any terms cannot be reframed as a conditional refusal. And even in cases like *linkLine*, where the complaints could be reframed as challenges to certain conditions (high wholesale prices), they cannot be reframed as challenges to conditions directly restricting forms of rivalry.

Notably, the cited article by Professor Hovenkamp does not support the court's treatment of plaintiffs' platform allegations. The court described the article as stating that "'simple refusal[s] to deal' covered by [*Trinko*] include 'refusal[s] conditioned on a firm's status that cannot readily be changed,' such as where a firm 'agree[s] to sell to [non]competitors but not []competitors.'" A251. Here, however, the restrictions allegedly were designed to deter emerging competition from app developers and incentivize them to evolve into non-competitors "lest they lose access to critical inputs from Facebook." A90 (¶ 187); *see also* A101 (¶ 230) ("Facebook used APIs and algorithms to prevent competition by ensuring that would-be competitors could not gain or maintain a foothold in the Personal Social Networking Services market and by discouraging new or adjacent firms from even

_____

license can violate Section 2. *See Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 666 (1944); DOJ-FTC Antitrust Guidelines for Licensing Intellectual Property § 5.6 (2017); *cf. Microsoft*, 253 F.3d at 64 (copyright holders cannot condition use of copyrighted work in a way that bars rivals from cost-efficient means of distribution).

entering the market.").  That is, the restrictions allegedly changed some app developers' trajectories from competitors to non-competitors.  Thus, even under the court's own standard, Facebook's imposition of restrictive conditions should not have been treated as a "simple refusal to deal" on a motion to dismiss.

### 2.    No Universal Checklist Governs All Unilateral Refusal-To-Deal Claims.

The district court also applied an incorrect standard for unilateral refusal-to-deal liability.  The court held that a "three-part test for unlawful refusals to deal" applied, which it drew from *Aspen Skiing*'s particular facts."  A243-A244.  Under that test, for Facebook's policy of denying API access to be unlawful, it had to be "enforced (i) against a rival with which the monopolist had a previous course of dealing; (ii) while the monopolist kept dealing with others in the market; (iii) at a short-term profit loss, with no conceivable rationale other than driving a competitor out of business in the long run."  A246.  There is, however, no rigid test for analyzing refusals to deal under Section 2.

The central question the Supreme Court considered in *Aspen* and *Trinko* was whether the defendant's refusal was "predatory"—i.e., characterized by "attempting to exclude rivals on some basis other than efficiency."  *Aspen*, 472 U.S. at 605; *see Covad Commc'ns v. Bell Atl. Corp.*,

19

398 F.3d 666, 675-76 (D.C. Cir. 2005) (refusal to deal must be "predatory"). That was proven in *Aspen* because Ski Co.'s "termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end," but not in *Trinko* because the complaint lacked factual allegations against Verizon suggesting "anticompetitive malice" or a predatory "motivation [for] its refusal." 540 U.S. at 407-09. Both cases show that the proper analysis is highly factual and depends on "the particular structure and circumstances of the industry at issue." *Id.* at 411. That fact-intensive analysis cannot be reduced to a checklist of requirements for every case. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 457 (7th Cir. 2020) (The "*Aspen Skiing* factors help case-by-case assessments of whether a challenged refusal to deal is indeed anticompetitive, even though no factor is always decisive by itself."), *cert. denied* 141 S. Ct. 2877 (2021); Brief for the United States as Amicus Curiae, *Comcast Corp. v. Viamedia, Inc.*, No. 20-319 (S. Ct.), at 10 (neither *Aspen* nor *Trinko* "adopt[ed] a universal standard governing all refusal-to-deal claims"), https://www.justice.gov/atr/case-document/file/1397716/download.

In determining whether a refusal had a predatory purpose, courts have considered whether the monopolist terminated a prior course of dealing, as in

*Aspen*. *Trinko*, 540 U.S. at 409. But where a monopolist's predatory purpose is evident from other facts, prior dealing is unnecessary. For instance, *Otter Tail Power Co. v. United States* focused on how the monopolist's refusal to sell wholesale power supply and transmission services to customers seeking to compete with it was designed "to prevent municipal power systems from eroding its monopolistic position." 410 U.S. 366, 377-78 (1973). Whether there was prior dealing was not a factor in the Court's analysis. *Id.*; *accord FTC v. Vyera Pharm., LLC*, 479 F. Supp. 3d 41, 49-50 (S.D.N.Y. 2020) (same).

Courts also have considered whether the refusal is "irrational but for its anticompetitive effect." *See, e.g.*, *Viamedia*, 951 F.3d at 463; *Novell*, 731 F.3d at 1075. For instance, a plaintiff could show that the conduct would not be profit-maximizing unless it drives rivals out of the market, blocks or delays potential rivals' entry, or "chasten[s]" rivals "sufficiently to abandon competitive behavior the predator finds threatening." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986); *cf. Covad*, 398 F.3d at 675-76 (predation can include "sacrific[ing] short-term profits in order to drive out of

the market or otherwise discipline a competitor").[5]  Courts generally cannot address this issue at the pleadings stage, however, because it involves assessing the defendant's proffered justifications for the refusal.  *Viamedia*, 951 F.3d at 462-64.[6]

Another factor that courts have considered is whether "valid business reasons exist for [the] refusal."  *Aspen*, 472 U.S. at 605, 608.  A defendant cannot merely *assert*, however, that its refusal served a legitimate purpose.  *See Viamedia*, 951 F.3d at 461-63 (rejecting Comcast's argument "that if a defendant merely postulates 'a valid business purpose'—apparently including any business purpose a defendant could dream up, regardless of feasibility or value—that 'ends the inquiry'"); *cf. Aspen*, 472 U.S. at 609 (Ski Co. asserted a justification that was not supported by the evidence).  The defendant must actually establish a justification that is sufficient in light of

---

[5] The district court's test recognized the possibility of driving rivals out of the market, but improperly disregarded other forms of predation, such as impeding entry or disciplining rivals.

[6] *Viamedia* observed that "the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a pleading standard," 951 F.3d at 462, and the court explained that various factors "could plausibly support the inference that a refusal to deal is 'prompted . . . by anticompetitive malice,'" *id.* at 463 (quoting *Trinko*, 540 U.S. at 409).  The court also expressed concern that such a requirement could lead to adverse policy consequences by wrongly allowing a refusal benefitting the defendant very slightly yet causing significant anticompetitive harm.  *Id.* at 461 n.13.

the plaintiff's showing that the refusal is predatory and harms competition. *See Aspen*, 472 U.S. 608 n.39 (relevant evidence may include "specific intent to engage in predation" or "evidence that the conduct was used threateningly and did not continue when a rival capitulated"); *cf. Viamedia*, 951 F.3d at 462 ("this more nuanced approach considering both procompetitive benefits and anticompetitive harms is necessary to answer the ultimate question of whether competition was harmed").

The district court, moreover, was wrong to suggest that a plaintiff must negate "a valid business purpose" in its complaint, A244 (citing *Covad*, 398 F.3d at 675), or allege the "predatory motivation [is] 'the only conceivable rationale or purpose'" for the refusal, *id.* (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020))—which the district court treated as the "most important[]" prong of the test it applied, A243-A244. In fact, this Court has rejected just such a pleading standard, explaining that whether a defendant's conduct is "economically justified" depends "upon a question of fact and therefore is not cognizable in support of a motion to dismiss." *Covad*, 398 F.3d at 676.[7]

---

[7] *Qualcomm* was decided after a full trial on the merits, not on the pleadings, and thus never addressed pleading standards.

In addition, the particular factors considered in *Aspen* are not exhaustive. A complaint could "provide a basis, under traditional antitrust principles, for recognizing" a refusal-to-deal claim under different circumstances. *Trinko*, 540 U.S. at 408. The fact-bound nature of refusals underscores the importance of a context-specific analysis of their character and effects. *Aspen* and *Trinko*, for example, both involved monopolists that refused to engage in collaborative business relationships with direct competitors, and on requested terms that the monopolist did not voluntarily offer anyone (competitors or not). Plaintiffs' allegations here are significantly different, including because they involve Facebook's selectively withdrawn deals (on standardized terms) with downstream app developers. These allegations require a context-specific analysis of whether they show the requisite predation.

### 3. This Case Presents Materially Different Market Realities From *Trinko*.

*Trinko* identified several reasons for limiting unilateral refusal-to-deal liability in the circumstances there. Facebook's network, however, is materially different from the physical telephone network in *Trinko* in several ways that favor greater antitrust enforcement in this context. Antitrust law retains the flexibility to address the distinct market realities presented by this case. *See NCAA v. Alston*, 141 S. Ct. 2141, 2158 (2021) (noting, in a rule-of-

24

reason case, that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities.  If those market realities change, so may the legal analysis." (citations omitted)).

Plaintiffs' complaint details a new kind of network built by users and businesses on top of Facebook's platform.  A92-A93 (¶¶ 195-198).  Facebook has an easily-scalable network and often can take on new connections at near-zero incremental cost, using the efforts and investment of users and third parties to expand the network and create value.  Indeed, *voluntary* interconnection is integral to Facebook's platform.  This stands in stark contrast to Verizon's telephone network in *Trinko*:  an end-to-end, monopolist-controlled physical infrastructure with limited space for sharing and interconnection occurring only because of regulatory compulsion.  *Cf. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("space constraints on digital platforms are practically nonexistent (unlike on cable companies), so a regulation restricting a digital platform's right to exclude might not appreciably impede the platform from speaking").

*Trinko* expressed concern that forced sharing of network connections would inhibit "the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  540 U.S. at 408.  That concern

applies quite differently here. Facebook's users and app developers build network connections driving significant value for the platform, and the restrictive conditions limited their potential gain from doing so. Thus, users' and developers' incentives to invest their time and money are enhanced by more antitrust enforcement. While Facebook also has made investments, the balance of relative incentives is an economic question that cannot simply be assumed based on the contrary factual situation in *Trinko*.

*Trinko* also noted that forced sharing "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Id.* But here, unlike in *Trinko*, the norm on Facebook's platform is sharing—not exclusion. Courts need not act as central planners because the anticompetitive conditions on API access simply could be enjoined or addressed through other traditional antitrust remedies.

Finally, *Trinko* expressed concern that forced sharing may "facilitate the supreme evil of antitrust: collusion." *Id.* But here the risk of collusion *supports* antitrust enforcement. Facebook is already dealing with the app developers, so collusive risk already exists through the deals' conditions restricting competition. Limiting antitrust scrutiny of those conditions exacerbates this risk by giving monopolists freer rein in reaching "agreements not to compete" with rivals. *Otter Tail*, 410 U.S. at 377.

26

Even if the restrictive conditions were imposed by unilateral policy rather than by agreement, they still would raise significant antitrust concerns. *See Lorain Journal*, 342 U.S. at 149.  By thwarting emerging competitive threats from app developers, Facebook's policies allegedly prevented app developers from creating (or contributing to the creation of) superior technologies that could erode Facebook's monopoly.  Monopolists may not use their monopoly power to insulate themselves from competition.  *See Microsoft*, 253 F.3d at 58, 63 (condemning anticompetitive restraints "prevent[ing] the effective distribution and use of products that might threaten [its] monopoly," including restrictions preventing original equipment manufacturers from promoting rival browsers).

## II.   THE DISTRICT COURT ERRONEOUSLY RULED OUT THE POSSIBILITY OF INJUNCTIVE RELIEF

The district court erroneously held that "Facebook's alleged scheme of serially revoking API access from competitor apps" is irremediable "as a matter of law."  A248-A249, A251.  It should not have ruled out the possibility of injunctive relief on the pleadings before the factual record has been developed.

"Antitrust relief should unfetter a market from anticompetitive conduct and pry open to competition a market that has been closed by defendants' illegal restraints."  *Ford Motor Co. v. United States*, 405 U.S. 562, 577-78

27

(1972) (citation omitted).  Antitrust relief is not limited to stopping ongoing anticompetitive conduct, but also includes preventing its recurrence, and "eliminat[ing] its consequences."  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *see United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (discussing considerations "in a § 2 case, upon appropriate findings of violation").  It "is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed," and so injunctions often "go[] beyond a simple proscription against the precise conduct previously pursued."  *Professional Engineers*, 435 U.S. at 698 (citation omitted).

Plaintiffs suing under Section 16 of the Clayton Act "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur."  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969).  The district court ruled categorically that Facebook's actions are unlikely to recur because facts outside of the complaint indicated that Facebook suspended its anticompetitive policy in 2018.  A231, A249.  But this determination is premature, as the factual record has not been developed, and the parties dispute whether Facebook will likely engage in similar behavior going forward.  Indeed, the FTC's complaint against Facebook—from which the

28

court drew the "fact" of the policy suspension—also alleges that "Facebook is likely to reinstitute such policies." A206.

The district court also unnecessarily discounted the potential for a "reparative injunction" to restore lost competition. *See* A249-A250. The court accepted that there was "ongoing" competitive harm: Facebook's "scheme allegedly blunted the growth of existing competitors"; "deterred other potential competitors from entering Facebook's market"; and "'discouraged outside investment' in new firms." *Id.* (citations omitted). But the court deemed "<u>that</u> specific injury" irremediable. *Id.* Without any factual development, however, this ruling was erroneous.

While the court correctly observed that plaintiffs seek divestiture, plaintiffs also sought injunctive relief against certain future conduct and other appropriate equitable relief "to restore competitive conditions and lost competition and to prevent future violations." A113-A114 (¶ 277). Courts have numerous injunctive options short of divestiture to restore lost competition. Thus, for example, Microsoft had to disclose APIs that would "facilitate" the "ability [of rival middleware] to run on multiple operating systems," though nondisclosure of those APIs "played no role" in its antitrust violation. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215-16 (D.C. Cir. 2004). This "forward-looking provision" restored competition by

29

"facilitating the entry" of new competitors to counteract Microsoft's unlawfully maintained monopoly. *Id.* at 1215-18. Likewise, injunctive relief here could engender new competition to Facebook even if it could not undo the specific practices by which Facebook unlawfully maintained its monopoly.

Moreover, contrary to the court's apparent view, *see* A250, divestiture is not categorically limited to cases where the violation is a merger or acquisition. *Microsoft* was a non-merger case, yet this Court prescribed a standard for evaluating the divestiture issue on remand. 253 F.3d at 80, 105-07. Furthermore, divestiture serves "several functions": it "puts an end to the combination or conspiracy when that is itself the violation"; "deprives the antitrust defendants of the benefits of their conspiracy"; and "break[s] up or render[s] impotent the monopoly power which violates the Act." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128-29 (1948). Even when the first function is unavailable, divestiture could still serve the other two. Thus, the court was wrong to lament its inability to "turn back the clock" and prevent the alleged "destruction of competition." A250. After all, divestitures sometimes create new competitors to restore competition. *See Cascade Nat. Gas Corp. v. El Paso Nat. Gas Co.*, 386 U.S. 129, 133 (1967).

*Microsoft* indicated a substantial burden for divestitures in "unitary companies" but distinguished defendants "formed by mergers and acquisitions."  253 F.3d at 105-06.  Here, Facebook allegedly grew in part through unlawful acquisitions.  Factual development may show that a remedial order—including the possibility of divestiture—could restore competition in the marketplace.

## CONCLUSION

This Court should correct the district court's misapplication of Section 2 of the Sherman Act and its misunderstanding of the scope of its remedial authority to restore lost competition.

31

Respectfully submitted.

/s/ Nickolai G. Levin

Jonathan S. Kanter
   *Assistant Attorney General*
Doha G. Mekki
   *Principal Deputy Assistant*
   *Attorney General*
David B. Lawrence
   *Policy Director*
Daniel E. Haar
Nickolai G. Levin
Adam D. Chandler
Cecilia Y. Cheng
   *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW #3320
Washington, DC 20530
202-514-2886

January 28, 2022    Nickolai.Levin@usdoj.gov
   *Counsel for United States of America*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), and D.C. Circuit Rule 32(e)(3), because, excluding the parts exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 6,364 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word 2019, using 14-point Times New Roman font, a proportionally spaced typeface.

s/ Nickolai G. Levin
Nickolai G. Levin

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2022, a copy of the foregoing

Response was electronically filed using this Court's CM/ECF system.

Participants in these consolidated cases are registered CM/ECF users, and

service will be accomplished by the CM/ECF system.


s/ Nickolai G. Levin
Nickolai G. Levin
